## UNITED STATES v. PEONI.

### No. 155.

Circuit Court of Appeals, Second Circuit.

Dec. 12, 1938.

Abraham Solomon, of New York City (Bernard Weiss, of New York City, of counsel), for appellant.

Michael F. Walsh, U. S. Atty., of Brooklyn, N. Y. (Vine H. Smith and James D. Saver, Asst. U. S. Attys., both of Brooklyn, N. Y., of counsel), for the United States.

Before L. HAND, SWAN and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Peoni was indicted in the Eastern District of New York upon three counts for possessing counterfeit money, and upon one for conspiracy to possess it. The jury convicted him on all counts, and the only question we need consider is whether the evidence was enough to sustain the verdict. It was this. In the Borough of the Bronx Peoni sold counterfeit bills to one, Regno; and Regno sold the same bills to one, Dorsey, also in the Bronx. All three knew that the bills were counterfeit, and Dorsey was arrested while trying to pass them in the Borough of Brooklyn. The question is whether Peoni was guilty as an accessory to Dorsey's possession, and

whether he was party to a conspiracy by which Dorsey should possess the bills.

The prosecution's argument is that, as Peoni put the bills in circulation and knew that Regno would be likely, not to pass them himself, but to sell them to another guilty possessor, the possession of the second buyer was a natural consequence of Peoni's original act, with which he might be charged. If this were a civil case, that would be true; an innocent buyer from Dorsey could sue Peoni and get judgment against him for his loss. But the rule of criminal liability is not the same; since Dorsey's possession was not de facto Peoni's, and since Dorsey was not Peoni's agent, Peoni can be liable only as an accessory to Dorsey's act of possession. The test of that must be found in the appropriate federal statute (§ 550 of Title 18, U.S.Code, 18 U.S.C.A. § 550). The first statute dealing with the matter was passed in 1790 (1 St. at L. 114) and made those accessories who should "aid and assist, procure, command, counsel or advise", murder or robbery on land or sea, or piracy at sea. Section 10. This was broadened in 1870 (16 St. at L. 254) to include any felony, and by it an accessory was anyone who "counsels, advises or procures" the crime, section 2: this phrase was probably regarded as an equivalent of the first. Both those statutes were repealed in 1909 by § 341 of the Criminal Code (35 St. at L. 1088, 1153), and supplanted by § 332 of that act, which like § 550 of Title 18 U.S. Code, 18 U.S.C.A. § 550, read as follows: "aids, abets, counsels, commands, induces, or procures". The substance of that formula goes back a long way. Pollock & Maitland, Vol. II, p. 507, in speaking of the English law at the beginning of the 14th Century, say that already "the law of homicide is quite wide enough to comprise * * *. those who have 'procured, counselled, commanded or abetted' the felony"; citing Bracton, f. 142, as follows: "for it is colloquially said that he sufficiently kills who advises" (praecipit) the killing. In 1557, by chapter 4 of 4 & 5 P. & M., benefit of clergy was taken away from those who should "command, hire and counsel" another to commit petit treason, murder, robbery or "willful" arson; and the indictment in Parker's Case, 1560, Dyer 186 a, read that the accused had "counselled, commanded, procured and abetted" the murder. Coke, Inst. II, p. 182, in commenting on the Stat. of West. 1, Chap.

XIV, which dealt with accessories, declared that they were divided into three "branches"; "commandement, force et aide". "Commandement" was "praeceptum" which included those who "incite, set on or stir up" others to the deed. "Force" was to furnish a weapon; and "aide" ("auxilium") included "all persons counselling, abetting, plotting, assenting, consenting or encouraging to doe the act." In 1691, by Chapter 9 of 3 & 4 W. & M., benefit of clergy was denied those who "comfort, aid, abet, assist, counsel, hire or command" certain enumerated felonies. Hale, Pleas of the Crown p. 615, 1736, defined an accessory as one who "doth * * * procure, counsel, command or abet another". In The Case of Macdaniel & others, 1755, Foster, 125, the question was bruited whether one might be an accessory at one remove, and it was said, though obiter, that he might, for "whoever procured a felony to be committed though it be by the intervention of a third person is an accessory * * * For what is there in the notion of commanding, hiring, counselling, aiding or abetting which may not be effected by the intervention of a third person." Blackstone, 1768, Book IV, pp. 36 & 37, described an accessory as "he who in any wise commands or counsels another to commit an unlawful act". Hawkins, 1771, Pleas of the Crown Chap. 29 § 16, specified "Those who by Hire, Command, Counsel or Conspiracy; and it seems to be generally holden, That those who by shewing an express Liking Approbation or Assent to another's felonious Design of committing Felony abet and encourage him to commit it".

It will be observed that all these definitions have nothing whatever to do with the probability that the forbidden result would follow upon the accessory's conduct; and that they all demand that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed. All the words used—even the most colorless, "abet"—carry an implication of purposive attitude towards it. So understood, Peoni was not an accessory to Dorsey's possession; his connection with the business ended when he got his money from Regno, who might dispose of the bills as he chose; it was of no moment to him whether Regno passed them himself, and so ended the possibility of further guilty possession, or

whether he sold them to a second possible passer. His utterance of the bills was indeed a step in the causal chain which ended in Dorsey's possession, but that was all. Perhaps he was Regno's accessory. Rudner v. United States, 6 Cir., 281 F. 516, and Anstess v. United States, 7 Cir., 22 F. 2d 594, do indeed hold that a seller, knowing the buyer's criminal purpose, is a conspirator with him. On the other hand in Rex v. Lomas, 22 Cox's Cr. Cas. 765, the court acquitted the accused who had given back to a burglar a jimmy which the burglar had lent him, though he knew the burglar would use it to commit the crime; Lord Reading saying that in such cases "advice or procuring" was a necessary element. Moreover, the law is at least unsettled whether action for the price will not lie, though the seller knows that the buyer means to use the goods to commit a crime, Williston, § 1754, and in perhaps the leading case, Graves v. Johnson, 179 Mass. 53, 60 N.E. 383, 88 Am.St.Rep. 355 the seller recovered. Be that as it may, nobody, so far as we can find, has ever held that a contract is criminal, because the seller has reason to know, not that the buyer will use the goods unlawfully, but that some one further down the line may do so. Nor is it at all desirable that the seller should be held indefinitely. The real gravamen of the charge against him is his utterance of the bills; and he ought not to be tried for that wherever the prosecution may pick up any guilty possessor— perhaps thousands of miles away. The oppression against which the Sixth Amendment is directed could be easily compassed by this device, because if the seller be a real accessory he may be removed to the place of the crime. Hoss v. United States, 8 Cir., 232 F. 328, 335; United States v. Littleton, D.C., 1 F.2d 751.

The same reasoning applies to the conspiracy count. Assuming that Peoni and Regno agreed that Regno should have possession of the bills, it is absurd to say that Peoni agreed that Dorsey should have them from Regno. Peoni knew that somebody besides Regno might get them, but a conspiracy also imports a concert of purpose, and again Peoni had no concern with the bills after Regno paid for them. At times it seemed to be supposed that, once some kind of criminal concert is established, all parties are liable for everything anyone of the original participants does, and even for what those do who join later. Nothing

could be more untrue. Nobody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it. The confusion is perhaps due to the fact that everything done by the conspirators—including the declarations of later entrants—is competent evidence against all, so far as it may fairly be thought to be in execution of the concert to which the accused is privy, though that doctrine too is often abused.

Conviction reversed; accused discharged.