**UNITED STATES v. BRUNO et al.**
No. 339.

Circuit Court of Appeals, Second Circuit.
July 10, 1939.

922

Herbert Zelenko, of New York City, for appellant Bruno.

Salvatore J. Iannucci, of New York City (M. Michael Edelstein, of New York City, of counsel), for appellant Iacono.

John T. Cahill, U. S. Atty., of New York City (Joseph P. Martin, Abel I. Smith, Jr., and William F. Young, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

PER CURIAM.

Bruno and Iacono were indicted along with 86 others for a conspiracy to import, sell and possess narcotics; some were acquitted; others, besides these two, were convicted, but they alone appealed. They complain, (1), that if the evidence proved anything, it proved a series of separate conspiracies, and not a single one, as alleged in the indictment; (2) that unlawful telephone "taps" were allowed in evidence against them; (3) that the judge refused to charge the jury properly as to the effect of their failure to take the stand; and (4) that there was not enough evidence to support the verdict.

The first point was made at the conclusion of the prosecution's case: the defendants then moved to dismiss the indictment on the ground that several conspiracies had been proved, and not the one alleged. The evidence allowed the jury to find that there had existed over a substantial period of time a conspiracy embracing a great number of persons, whose object was to smuggle narcotics into the Port of New York and distribute them to addicts both in this city and in Texas and Louisiana. This required the coöperation of four groups of persons; the smugglers who imported the drugs; the middlemen who paid the smugglers and distributed to retailers; and two groups of retailers—one in New York and one in Texas and Louisiana—who supplied the addicts. The defendants assert that there were, therefore, at least three separate conspiracies; one between the smugglers and the middlemen, and one between the middlemen and each group of retailers. The evidence did not disclose any coöperation or communication between the smugglers and either group of retailers, or between the two groups of retailers themselves; however, the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole. That distinguishes the situation from that in United States v. Peoni, 2 Cir., 100 F.2d 401, where Peoni, the accused, did not know that Regno, his buyer, was to sell the counterfeit bills to Dorsey, and had no interest in whether he did, since Regno might equally well have passed them to innocent persons himself. Rudner v. United States, 6 Cir., 281 F. 516, 519, 520; Jezewski v. United States, 6 Cir., 13 F.2d 599, 602. It might still be argued that there were two conspiracies; one including the smugglers, the middlemen and the New York group, and the other, the smugglers, the middlemen and

the Texas & Louisiana group, for there was apparently no privity between the two groups of retailers. That too would be fallacious. Clearly, quoad the smugglers, there was but one conspiracy, for it was of no moment to them whether the middlemen sold to one or more groups of retailers, provided they had a market somewhere. So too of any retailer; he knew that he was a necessary link in a scheme of distribution, and the others, whom he knew to be convenient to its execution, were as much parts of a single undertaking or enterprise as two salesmen in the same shop. We think therefore that there was only one conspiracy, and it is not necessary to decide how far Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, would independently have covered the situation, had there been more than one.

■ The next question concerns the admission of evidence alleged to have been incompetent, because derived through the unlawful tapping of a telephone. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314. This consisted of the record of a dictagraph machine which had been interposed in a circuit leading from a telephone in a room used by a government agent who was posing as a buyer of narcotics. The agent was present when a conspirator used the telephone, and testified to what he heard; the record was used to corroborate him. His testimony was that while he was bargaining with LaRose—one of the New York distributors in New York —LaRose said that the drug—cocaine— was in Bruno's possession. LaRose then called up Bruno, who was also in New York and talked to him in Italian which the agent could not understand. The record confirmed the fact that LaRose had called up Bruno and that they had talked in Italian, but no more. In United States v. Weiss, 2 Cir., 103 F.2d 348, we held that the statute, 47 U.S.C.A. § 605, did not extend to intrastate telephone talks, and that alone would be enough here; but against the possibility that the Supreme Court may take another view, we think that, even though the record was incompetent, its admission was not serious enough error to justify reversal. True, it did confirm the agent's testimony that LaRose talked to Bruno, and that in turn corroborated what the agent said LaRose had told him of Bruno's part in the sale. We do not believe, however, that the result would have been different, had the agent's testimony stood alone, for, although the only other testimony incriminating Bruno was of accomplices, there was nothing to shake the agent's testimony, or any reason, except possible excess of zeal, to doubt the truth of what he said. The proof of guilt was too strong to upset the verdict for such an error, if it was an error at all.

■■ Finally as to the judge's charge. He was asked to tell the jury that they should not take it against the defendants that they had not testified in their defense. This he failed to do, and told them instead that it was a defendant's privilege to testify, but that when he did so, his credibility was "to be determined in the light of his interest which * * * is * * * a matter which may seriously affect the credence that shall be given to his testimony." It must be confessed that this was not the equivalent of what the defendant had requested. We have not been able to find much that is helpful by way of interpretation of the statute, § 632, Title 28, U.S.Code, 28 U.S. C.A. § 632. In Stout v. United States, 8 Cir., 227 F. 799, 803, 804, it was assumed that if such a request were made, it would be error to refuse it; and in Hersch v. United States, 9 Cir., 68 F.2d 799, 802, that was definitely held, though apparently less because the instruction was itself important, than because an earlier comment of the judge had made it so. On the other hand in Swenzel v. United States, 2 Cir., 22 F.2d 280, we held that such a refusal did not require us to reverse. The statute is primarily intended to prevent the affirmative use of the accused's failure as an inference of guilt; and it would not be an error to refuse to charge the jury that they must not make that inference—at least it would not be except under some unusual circumstances that we cannot foresee. The important thing to bear in mind is the probable futility of the instruction. When an accused does not take the stand, everybody knows that he fears to do so, for a man will not forego anything that may exculpate him. Sometimes no doubt he may merely be afraid that he cannot get out the truth on the stand, but that is very seldom. Ordinarily, it is because he fears the disclosure which will result. Everybody knows this, and nobody can fail to make the inference, if he thinks about it at all; the accused's only safety is in having his failure kept as much as possible in the background. Hence the real protection, and the only practical protection, is in pre-

venting the prosecution from using it as the basis of an inference of guilt. That is indeed a very real protection, for the prosecution's freedom would be a very deadly weapon; but the advantage derivable from an admonition by the judge that the jury shall make no such inference is wholly illusory; and only serves to put before them what will generally harm the accused, if it does anything at all.

The last point is as to the sufficiency of the evidence. There is nothing to be said about this as to Bruno, who was plainly guilty. Iacono was probably guilty also, but the evidence to establish his guilt was tenuous. All that was shown was that he had received in New York seven money orders from members of the Louisiana retailers, some of them taken out in assumed names. They were for about $6,800 in the aggregate, but it did not appear that they covered the proceeds from the sales of narcotics. Even if these documents were enough to convict Iacono of complicity in some sort of illicit enterprise—itself a somewhat gratuitous assumption—the accused were shown to have been a disreputable lot and all sorts of ventures may have been afoot among them. The remittances should have been more closely interwoven with the sale of narcotics. The case is close, but we think that not enough was shown.

Judgment reversed as to Iacono.

Judgment affirmed as to Bruno.