# NYE & NISSEN, A CORPORATION, ET AL. *v.* UNITED STATES.

No. 228.   Argued March 3, 1949.—Decided April 18, 1949.

*Joseph B. Keenan* argued the cause for petitioners. With him on the brief were *Robert T. Murphy* and *Harold C. Faulkner.*

*Philip Elman* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Campbell, Robert S. Erdahl* and *Philip R. Monahan.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Nye & Nissen is a corporation which during the years covered by the indictment was engaged in the business of purchasing and selling eggs, butter, and cheese in San Francisco. Throughout this period Moncharsh was president of the corporation, one of its directors, and the owner of one-third of the stock of the holding company which had sole ownership of Nye & Nissen. Moncharsh's mother owned a one-third interest in the holding company, while the other third was owned by one Baum who lived in New York. Berman and Goddard were brothers-in-law of Moncharsh—the former being city sales manager of Nye & Nissen in charge of the company's

retail salesmen, the latter being shipping and receiving clerk. Menges was another employee.

During the period from 1938 to 1944, Nye & Nissen made large sales of its products to the Army and Navy and, after December, 1943, to operators of various vessels having general agency contracts with the War Shipping Administration.

An indictment in seven counts was returned on June 20, 1945, against Nye & Nissen, Moncharsh, Berman, Goddard and Menges. The first count charged the defendants with having conspired to defraud the United States from 1938 to 1945, in violation of § 37 of the Criminal Code, 18 U. S. C. § 88,[1] now § 371, by designated fraudulent practices to which we will refer. The other six counts charged the defendants with violations of § 35 of the Criminal Code, 18 U. S. C. § 80,[2] now § 1001, by mis-

---

[1] "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

[2] "Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States or of any corporation

representing in invoices presented to the War Shipping Administration in April and May, 1944, the weights, grades, and prices of specified sales of eggs and cheese.

Menges was acquitted. Berman and Goddard were found guilty on all counts, sentenced to a year and a day on each count, the terms to run concurrently, and fined $700. They did not appeal. Nye & Nissen was found guilty on all counts and fined $5,000 on each. Moncharsh was convicted on all counts and sentenced to two years' imprisonment on the first and to five years on each of the other six, all seven terms to run concurrently. He was also fined $5,000 on each count. On appeal the judgments of conviction of Nye & Nissen and Moncharsh were affirmed. 168 F. 2d 846. The case is here on a petition for certiorari which we granted because of doubts whether the conviction of Moncharsh on the substantive counts could be sustained under the theory of *Pinkerton* v. *United States,* 328 U. S. 640, on which the Court of Appeals seemed to rely.

Two preliminary questions are presented. It is argued in the first place that there was a variance prejudicial to Moncharsh between the conspiracy charged and the proof, in that the evidence tended to show the existence of two separate conspiracies of different characters and involving different persons. The contention is that the conspiracy charged was a continuing one from 1938 to 1945, and involved the circumvention of the Government's inspection system with relation to the sale of eggs. It is said that the proof showed two separate and distinct conspiracies—the first embracing Berman, Goddard, Moncharsh and Menges in an undertaking to defraud the United States by impeding and impairing the

in which the United States of America is a stockholder, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

Government's inspection system with relation to the sales of eggs to the Army and Navy from 1938 to 1942; the second embracing Berman and Goddard alone in an agreement in 1943 and 1944, to file false vouchers with the War Shipping Administration. We need not take the space to relate why under that theory Moncharsh is said to have been prejudiced, because the argument that there was a variance seems to us to lack merit. The case was submitted to the jury on the basis of a single conspiracy throughout the period alleged in the indictment. That was proper, for as we read the indictment it charged a single conspiracy to defraud the United States in various ways: by grading and selling to agencies of the Government inferior products through frauds practiced upon its inspectors and representatives; by impeding and defeating the functions of government agencies in the inspection, grading, weighing, and purchase of eggs, butter, and cheese; by utilizing various schemes to circumvent and avoid the standards, grades, weights, and specifications to which the orders were subject; and by misrepresenting the grade, weight, and price of eggs, butter, and cheese. The fact that certain types of fraudulent practices occurred during one period and other types at different periods is without significance. The circumvention of the inspection system and the presentation of false invoices were part and parcel of the same conspiracy as charged and proved. There was an abundance of evidence, as the Court of Appeals held, from which the jury could conclude that there was one continuous and persistent conspiracy to defraud. It is conceivable that the jury might conclude that beginning in 1943 or thereabouts Moncharsh severed himself from the conspiracy and that his subordinates carried it forward on their own. But we could not reverse them if that theory taxed their credulity.

It is argued in the second place that the trial court erred in admitting against Moncharsh evidence of crimes similar to those charged in the substantive counts to prove the guilty intent with which the substantive acts were committed. Each of the six substantive counts charged the presentation of a separate false invoice. The evidence showed the presentation of eleven other false invoices. This was part of the evidence received in support of the conspiracy count. The trial court also admitted it at the conclusion of the case "for the sole purpose of proving guilty intent, motive, or guilty knowledge" of the defendants. Evidence that similar and related offenses were committed in this period tended to show a consistent pattern of conduct highly relevant to the issue of intent.[3]

The principal question in the case pertains to the charge concerning the substantive offenses and the sufficiency of the evidence to support them.

In *Pinkerton* v. *United States, supra,* a conspiracy and substantive offenses were charged. We held that a conspirator could be held guilty of the substantive offense even though he did no more than join the conspiracy, provided that the substantive offense was committed in furtherance of the conspiracy and as a part of it. A verdict on that theory requires submission of those fact issues to the jury. That was not done here. Hence Moncharsh argues that he is entitled to a new trial.

The difficulty with that argument is that the case was submitted to the jury on an equally valid theory. The trial court charged that one "who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act as if he committed it directly." That theory is well engrained in the law. See

---

[3] See 2 Wigmore, Evidence (3d ed., 1940) §§ 302–304; 1 Wharton, Criminal Evidence (11th ed., 1935) §§ 349–352.

§ 332 of the Criminal Code, 18 U. S. C. § 550,[4] now § 2; *United States* v. *Johnson,* 319 U. S. 503, 518; *United States* v. *Dotterweich,* 320 U. S. 277, 281.   In order to aid and abet another to commit a crime it is necessary that a defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."   L. Hand, J., in *United States* v. *Peoni,* 100 F. 2d 401, 402.

There is no direct evidence tying Moncharsh to the six false invoices involved in the substantive counts. Yet there is circumstantial evidence wholly adequate to support the finding of the jury that Moncharsh aided and abetted in the commission of those offenses.   Thus there is evidence that he was the promoter of a long and persistent scheme to defraud, that the making of false invoices was a part of that project, that the makers of the false invoices were Moncharsh's subordinates, that his family was the chief owner of the business, that he was the manager of it, that his chief subordinates were his brothers-in-law, that he had charge of the office where the invoices were made out.

Those activities extended throughout the period when the substantive crimes were committed.   They constitute ample evidence in a record reeking with fraud that Moncharsh was associated with the presentation of the six false invoices.   The fact that some of that evidence may have served double duty by also supporting the charge of conspiracy is of course immaterial.

We see therefore no reason to exculpate him as an aider and abettor.   There was no inadequacy in the charge to the jury on that theory.   Nor was the submission in con-

---

[4] "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

flict with *Pinkerton* v. *United States, supra.* The rule of that case does service where the conspiracy was one to commit offenses of the character described in the substantive counts. Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. *Pinkerton* v. *United States* is narrow in its scope. Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one assists another in performing. The fact that a particular case might conceivably be submitted to the jury on either theory is irrelevant. It is sufficient if the proof adduced and the basis on which it was submitted were sufficient to support the verdict.

*Affirmed.*

MR. JUSTICE FRANKFURTER, dissenting.

Scarcely more than a recital of the history of these proceedings will expose the reasons why I cannot agree with the Court.

Moncharsh, with the other defendants, was indicted on seven counts. The first count charged conspiracy to defraud the United States. The other six counts charged the presentation of false invoices to the War Shipping Administration. The trial court correctly instructed the jury as to the findings necessary to support a conviction of guilty on the conspiracy count; it also correctly defined what is necessary to conclude that the defendant had aided and abetted commission of the substantive crimes charged in the remaining counts. On April 6, 1946, the jury found Moncharsh guilty as charged on all counts. He appealed, challenging, *inter alia,* the sufficiency of the evidence as to each.

To sustain on appeal the conviction for the substantive crimes, the Government chose not to insist upon the sufficiency of the evidence to sustain a finding by the jury that Moncharsh had aided and abetted the commission of the substantive offenses. It urged instead the applicability of the decision of this Court in *Pinkerton* v. *United States,* 328 U. S. 640, decided June 10, 1946. The Court of Appeals, regarding that case as controlling, was eloquently silent as to the sufficiency of the evidence to sustain a finding of aiding and abetting.

This Court now finds that the theory of the *Pinkerton* case cannot support the conviction. I agree that it cannot. The charge to the jury in that case made explicit that in order to supply the lack of direct evidence of participation in the substantive offenses, the jury could regard their finding, if they made one, that a conspiracy existed as sufficient to support a conviction on those counts, but it could do so only "provided the acts referred to in the substantive counts were acts in furtherance of the unlawful conspiracy . . . ." 328 U. S. 640, 645–46, n. 6. Here also direct evidence was lacking, but there was no such charge, and so I join the Court in rejecting the applicability of the *Pinkerton* theory.

The Court thus recognizes that the *Pinkerton* doctrine is available only if (1) there is a connection between the conduct of the conspiracy and the commission of the substantive offenses, and (2) the jury has been instructed that evidence establishing guilt of conspiracy cannot be used as a basis for conviction upon the substantive counts unless it has found the necessary connection to exist. The importance of these requirements lies in this: only when a jury has been properly instructed as to the relevant standards to be applied to the evidence does a basis exist for determining whether evidence sufficient to support the verdict was presented to it. See *Bollenbach* v. *United States,* 326 U. S. 607, 613–615. The

relevant question is not was the evidence sufficient, but was it sufficient to fulfill the required standards.

If this were all, we should reverse even though the record contained evidence which would have supported a finding that the acts referred to in the substantive counts were acts in furtherance of the unlawful conspiracy. But there remains the possibility of affirming on the ground that the record nevertheless contains evidence sufficient to support conviction for the substantive counts upon the theory of aiding and abetting, since the trial court did submit the substantive counts to the jury on a legally proper exposition of that theory and the jury apparently found that the evidence fulfilled the standards established. But the defendant challenges the jury's right so to find; he insists that the evidence is insufficient to establish his responsibility as an aider and abettor. As the case came before the Court of Appeals it did not feel called upon to meet this challenge. This was evidently due to the fact that the Government had shifted its position—a shift doubtless induced by the fact that the *Pinkerton* decision, rendered after the case went to the jury, offered a tempting short-cut by which to sustain the verdict.

It may well be that the record supports the jury's finding of guilt on the substantive counts. But that question can be answered only by facing petitioner's challenge to the insufficiency of the evidence. This challenge is hardly met by examining bits and pieces of the record or by reliance on atmospheric emanations of guilt. The whole record must be canvassed, and the state of this Court's business precludes such an undertaking. It is a task especially to be avoided in view of the provision of the Evarts Act of 1891, underlined by the Judiciary Act of 1925, making criminal appeals final in the Courts of Appeals, reserving to this Court to grant further review in those rare instances where a serious issue of law or a

conflict between the Courts of Appeals presents an issue of true public importance. The question of evidentiary sufficiency here at issue exemplifies precisely those burdensome features which led Congress to free this Court from such a wasteful responsibility. The record comprises twelve volumes, including 4,630 pages. It is not conceivable that the case would have been brought here for the purpose of canvassing such a record. We should not now undertake the task merely because the need to do so is unexpectedly presented, nor do we contribute to sound judicial administration by adopting a conclusion, on a necessarily partial examination of the record, which the Court of Appeals itself, though it must have examined the record, refrained from adopting.[1] Our duty is

---

[1] The following excerpts from the opinion of the Court of Appeals make clear how firmly it placed its decision upon the *Pinkerton* doctrine rather than upon a determination of the sufficiency of the evidence.

". . . Here the case was submitted to the jury with an instruction under 18 U. S. C. A. § 550 that 'one who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act as if he committed it directly.' It is the gist of appellant's [*sic*] contention in this respect that unless there is substantial evidence to support the verdict under the instructions which were given, the verdict cannot be sustained on the ground that the evidence was sufficient under a theory as to which the jury was uninstructed.

"No authority is cited in support of the point so raised and our search fails to reveal any federal case in which it has been expressly considered. . . .

"Whatever the answer to this problem may be, we are of the opinion that the verdict of the jury on the substantive counts did not disregard or go beyond the scope of the instructions given. Appellants' contention to the contrary is answered by the Pinkerton case itself.

"So long as the conspiracy existed, the members acted for each other in carrying it forward. The criminal intent to commit substantive offenses in furtherance of the unlawful project was established by the formation of the conspiracy." 168 F. 2d at 854.

not to sustain merely on the basis of a general sense that crime has been committed; our duty is to sustain only if the applicable procedural requirements have been satisfied. Now that the theory has been rejected which made it unnecessary for the Court of Appeals to pass on the sufficiency of the evidence to support the charge of aiding and abetting, we should remand the case so that it may do so. *Bates* v. *United States,* 323 U. S. 15.

Plainly the Court cannot undertake the task from which Congress has happily relieved it. By failing to do so, however, it leaves room for doubt whether it has regarded the conviction for conspiracy as the damning fact which establishes guilt of the substantive offenses. Granted that evidence tending to establish guilt of the conspiracy may also be relevant to establish association with the substantive crimes, it is wholly immaterial, in the absence of such an instruction as that given in the *Pinkerton* case, that the defendant has been found guilty of conspiracy. Yet the Court points to the "evidence that he was the promoter of a long and persistent scheme to defraud," and adds that "those activities extended throughout the period when the substantive crimes were committed." The former statement on its face is no more than a way of saying that he was convicted of a conspiracy to defraud, and surely the fact that this scheme was contemporaneous with the commission of unrelated crimes does not supply the lack of an instruction which would make guilt of participation in it available as proof of aiding and abetting those crimes.

The instruction given in the *Pinkerton* case was needed to inform the jury of the conditions under which they might use a finding that the defendants were guilty of conspiracy as circumstantial evidence of guilt of the substantive offenses. An instruction as to aiding and abetting serves no such function, for it leaves wholly at large

the bearing of the crime of conspiracy upon the substantive offenses. For the same reasons, therefore, that it cannot be assumed, in the absence of such an instruction as that given in the *Pinkerton* case, that the acts referred to in the substantive counts were acts in furtherance of the unlawful conspiracy, so it cannot be assumed that the acts constituting the conspiracy were found by the jury to be acts aiding and abetting the substantive offenses. Without more, the aiding and abetting instruction was sufficient only to entitle the jury to draw inferences supplying the lack of evidence of the defendant's direct participation in the substantive offenses from the circumstantial evidence offered to establish commission of those offenses. Lacking a *Pinkerton* instruction, the finding that a conspiracy existed cannot be used to fill out that circumstantial evidence.

I am left in doubt, therefore, whether in lieu of a charge to the jury the Court is fabricating a rule of law. The Court itself seems to draw the inference that the defendant, because of his position and connection with the conspiracy, must inevitably have been associated as an aider and abettor in the commission of the substantive crimes. For an appellate court to draw such an inference is to make it a rule of law that the same inference must be drawn in every similar case. It is to create, in other words, a presumption that whenever A has been found guilty of conspiring with B and C to bring X, Y and Z to pass, and A and B commit the substantive offenses L, M and N, during the life of this conspiracy, C is an aider and abettor with A and B in the commission of L, M and N.

Clarity as to the ground on which a criminal conviction is sustained is indispensable to Anglo-American notions of criminal justice; it is no less indispensable for the guidance of district courts in future prosecutions for con-

spiracy. Such prosecutions are appropriate to reach a combination united to accomplish defined criminal purposes; the concept of conspiracy is not an invitation to circumvent the safeguards in the prosecution of crime which are the special boast of our democratic society by making it a device to establish guilt, not on the basis of personal responsibility, but by association, and we should be at pains to forestall the implication that we have so extended it. My brother JACKSON has impressively shown the grave dangers of abuse to which conspiracy charges so readily lend themselves. *Krulewitch* v. *United States,* 336 U. S. 440, 445. They are dangers which the Conference of Senior Circuit Judges has strikingly pointed out, and long before that judges who had observed these abuses in practice had warned against them.

> "There seems to be an increasing tendency in recent years for public prosecutors to indict for conspiracies when crimes have been committed. A conspiracy to commit a crime may be a sufficiently serious offense to be properly punished; but, when a crime has been actually committed by two or more persons, there is usually no proper reason why they should be indicted for the agreement to commit the crime, instead of for the crime itself. . . . Prosecutors seem to think that by this practice all statutes of limitations and many of the rules of evidence established for the protection of persons charged with crime can be disregarded. But there is no mysterious potency in the word 'conspiracy.' If a conspiracy to commit a crime has been carried out, and the crime committed, the crime, in my opinion, cannot be made something else by being called a conspiracy." *United States* v. *Kissel,* 173 F. 823, 828 (C. C. S. D. N. Y.).

Neither can a conspiracy to commit one crime be made to establish another crime by resort to the doctrine of aiding and abetting.

As to other issues canvassed by the Court of Appeals, among them the admission of proof of similar crimes to show intent, I do not mean to imply agreement with its views. For the reasons I have stated, I believe that the judgment should be reversed and the case remanded to the Court of Appeals.

MR. JUSTICE JACKSON and MR. JUSTICE RUTLEDGE join in this opinion.

MR. JUSTICE MURPHY, dissenting.

The petitioners were indicted for seven offenses. The first was a conspiracy to defraud the Government between 1938 and 1945. The remaining counts charged six specific instances of that fraud. Serious attack has been made in this Court on the petitioners' convictions under the six substantive counts. The Court upholds those convictions. It finds sufficient evidence to establish the fact that petitioners aided or abetted the perpetration of the substantive offenses; and since 18 U. S. C. § 2 makes an aider or abettor a principal, the petitioners are guilty of the substantive offenses.

The trial lasted nearly three months. The judge's charge to the jury began with an analysis of the conspiracy count, and offered several definitions of the term "conspiracy." Some were traditional. But one was this: "If a person, understanding the unlawful character of a transaction, encourages, advises, or in any manner, with a purpose to forward the enterprise or scheme, assists in the prosecution, he becomes a conspirator." Later in the analysis of the conspiracy count, a definition of "abetting" was given. It was immediately followed by this statement: "In this connection" the acts and dec-

larations of a *conspirator* are admissible against other conspirators.

The judge then passed to the substantive offenses. And he charged: "One who aids, abets, counsels, commands, induces, *or* procures the commission of an act is as responsible for that act as if he committed it directly." [1] The jurors were not told what the terms "counsel" or "induce" signified. Abetting, in the context of the substantive crimes, was not defined. Most important, the jurors were not told how to use a belief that conspiracy existed as evidence in itself of the substantive crimes. There was no attempt to sketch differences between abetting, counseling, inducing, and conspiring.

Yet the convictions are upheld in this Court on the theory that the jury found aiding or abetting. In this Court, then, aiding or abetting fraud becomes the substantive offense. Finding sufficient evidence to support the verdict on this theory of the substantive counts, the Court holds that failure to instruct of the relationship between conspiracy and aiding or abetting is unimportant.

I cannot agree. Conviction of the guiltless bystander is, of course, the great danger when conspiracy counts and substantive counts are tried together. A letter is written, a call is made, and the foundation is laid. The jury is subject to the temptation of generalizing; its confusion makes that temptation harder to resist. *Pinkerton* v. *United States,* 328 U. S. 640, as interpreted today, attempted to place limitations on this process. A conspiracy's mere joiner is not guilty of the substantive offense unless the substance was part of the conspiracy and in furtherance of it. The trial judge must so warn the jury.

The policy which required cautions in the *Pinkerton* case requires the same cautions here. This voluminous

---

[1] Emphasis added.

record, and the judge's instructions in particular, are replete with possibilities of confusion for the juror. The Court states that the crime of aiding or abetting the commission of a substantive offense is "well engrained in the law." And so it is. 18 U. S. C. § 2; *United States* v. *Peoni,* 100 F. 2d 401.

Attorneys may have an accurate idea what action constitutes aiding, abetting, counseling, inducing, or procuring. Counseling, in this context, means advising, or recommending. Although "conspiracy" means a variety of things, see *Krulewitch* v. *United States,* 336 U. S. 440, concurring opinion, we realize that the concept of at least implicit agreement may mark it somewhat apart from counseling, for example, or inducing. See *Thomas* v. *United States,* 57 F. 2d 1039, 1042; *United States* v. *Mack,* 112 F. 2d 290, 292.

Precise use of words is part of the lawyer's craft. But we expect too much of a juror when we ask him to make intelligent distinctions after a three-month trial and after instructions such as those I have quoted above—in an area of law which is difficult enough for the seasoned attorney. See *United States* v. *Sall,* 116 F. 2d 745, overruled in *Pinkerton* v. *United States, supra.*

In this case an intelligent verdict on the substantive counts seems scarcely possible. The jury may have used the proof of conspiracy as proof in itself of the other offenses—the substantive crimes of aiding or abetting fraud on the Government. As the Court interprets *Pinkerton,* it is beyond question that such use would be improper, without a warning that the substantive crime must be committed in furtherance of the conspiracy and as a part of it. We do not know, we cannot know, what evidence was determinative of guilt in the jury room.

An appellate court has no business deciding for itself that there is sufficient evidence to convict, when the triers of fact may have considered improper evidence their

basis for the finding of guilt. The presence of proper evidence has no relevance whatever. At the very least, the judge should instruct the jury that there is a difference between the real participation contemplated in aiding or abetting, and the more remote plotting embraced by simple "conspiracy," *United States* v. *Peoni, supra,* at 402, although one may be both conspirator and abettor.

Guilt by association is a danger in any conspiracy prosecution. Its consequences are more serious when a substantive crime is also charged. But when the magic words "counseling" or "inducing" are injected to "define" the substantive crimes, the danger and its consequences reach a new high. It is hard to assess the effect of a trial judge's charge upon a jury's unsophisticated belief in defendants' bad conduct. But it is our duty to do what we can by way of warning. Clarity is indispensable.

The guilt or innocence of Moncharsh and Nye & Nissen is relatively unimportant. The effect of today's decision on future trials, however, will be serious indeed. The Court gives further comfort to the dragnet theory of criminal justice. The judgment should be reversed.