**UNITED STATES of America,**
**Appellee,**

v.

**SIN NAGH FONG, Appellant.**

**No. 73-2352.**

United States Court of Appeals,
Ninth Circuit.

Jan. 11, 1974.

William C. Snouffer, Portland, Or. (argued), for appellant.

Jack C. Wong, Asst. U. S. Atty., Portland, Or. (argued), for appellee.

Before BROWNING and SNEED, Circuit Judges, and BURKE,* District Judge.

## OPINION

PER CURIAM:

Appellant was charged under a three-count indictment with conspiracy to distribute narcotic drugs and possession of narcotic drugs with intent to distribute in violation of Title 21 U.S.C. §§ 841(a)(1) and 846. The facts which underlie this conviction essentially revolve around four trips by co-defendant Eugene Rogers and a Government informer, Allen Johnson, from Seattle, Washington to Portland, Oregon where Rogers met with Appellant.[1]

On December 27, 1972, agents of the Bureau of Narcotics and Dangerous Drugs in Seattle, Washington were contacted by an informer named Allen Johnson regarding possible purchases of heroin from one Eugene Rogers. On December 29, 1972, after federal agents had searched both Johnson's person and his automobile for contraband, the informer was supplied Government funds and followed to Eugene Rogers' residence in Seattle. Surveillance was maintained as the two men proceeded to Portland, Oregon and checked into a motel room. Immediately after their arrival at the motel, Rogers left the room and made a telephone call. Within a short time, Appellant was observed arriving at the motel parking lot and engaging in a brief conversation with Rogers after the latter had entered Appellant's automobile. Following the conversation, Appellant quickly left the area. Later that evening, Johnson and Rogers returned to Seattle. Johnson subsequently turned

---

* Hon. Lloyd H. Burke, District Judge for the Northern District of California, sitting by designation.

1. The facts as set out below have in substantial part been taken from the Government's brief.

over to the agents approximately 10.5 grams of heroin which he had obtained from Rogers.

On January 13, 1973, Johnson again contacted the federal agents to inform them of an impending heroin transaction. Johnson and his car were searched for contraband, then followed to Rogers' residence. Surveillance continued as Johnson and Rogers traveled to Portland and checked into a motel in the early hours of the next day. Surveillance was simultaneously being maintained on Appellant, who was observed leaving his residence and meeting with Rogers in the latter's motel room. During this time Johnson was not present, having met with the federal agents, had his person and automobile again searched for contraband, and been instructed to obtain a sample of any heroin which Rogers was able to purchase if possible. After Rogers had left the motel Johnson supplied the agents with a sample, later established to be heroin, which he had taken from a plastic baggie containing approximately 1 ounce of brown powder.

On January 15, 1973, Appellant was seen for the third time meeting with Rogers at a Portland motel. The agents observed Appellant entering Rogers' room, whereupon one of the officers proceeded to station himself in an adjoining room. Without using any form of listening device and without either opening or putting his head to the connecting door between the two rooms, the agent was able to overhear the two discussing their narcotics transactions.[2] Subsequent surveillance verified that Appellant and Rogers were the only two men in the room at that time.

On January 18, 1973, Johnson once again met with the federal agents and was instructed to make a heroin purchase from Rogers. He was searched, followed to Rogers' residence, searched again and given government funds with which to transact the deal. Surveillance was then instituted. Later that evening,

---

2. The agent overheard and was able to testify to the following exchange:

> At the time I entered, Mr. Fong and Mr. Rogers were involved in a conversation about Chinese Restaurants, talked in general terms in the operations involved. During this conversation, Mr. Rogers interrupted Mr. Fong and asked him if he had the stuff. Mr. Fong stated that he couldn't get it until Mr. Rogers got the money. Mr. Fong stated that his connection in Los Angeles had promised him one to six kilos, but something was wrong, since it hadn't arrived yet. He jokingly mentioned at that point that *someone could have beat them for $6,000.* He stated that he had called this man in Los Angeles and this individual had told him to fly down to Los Angeles and they should be able to straighten out the problem.
>
> Mr. Fong indicated that he was unable to move because they had a hold on him. He indicated that it was almost like still being in jail. At this point Mr. Rogers agreed. Mr. Fong stated that until he received his load, that he could only deal brown H. Told Mr. Rogers that the *brown heroin was fifty percent, could be cut four times, and would double Mr. Rogers' money.*
>
> Mr. Rogers stated that he had obtained a connection for brown stuff in Seattle. He referred to a negro male who was at that time involved in testing the brown heroin for quality and would report to Mr. Rogers when Mr. Rogers returned to Seattle.
>
> At this—at this point, Mr. Fong told Mr. Rogers that he could deal, that is Mr. Fong could deal, two pieces of brown any time Mr. Rogers could get the money together.
>
> Mr. Rogers asked Mr. Fong when he believed his—he would get his problem straightened out. Mr. Fong replied that his load would probably not come in for another two weeks. Mr. Fong then reiterated that *he could deal the two pieces of brown anytime Mr. Rogers got the money.* Mr. Rogers stated that he was in a process of putting the money together, that he should have it, have the money, by the following day and would call Mr. Fong at noon the following day.
>
> Q. Okay, Mr. Hunt. Now, going back to your testimony, when Mr. Fong mentioned the problem about transportation, was anything else said about using other people?
>
> A. Yes. At that point in the conversation, Mr. Fong did indicate that traveling was his big problem and that he was trying to—or, he was *in the process of trying to hire a girl that would do his traveling and conduct his business for him.* He indicated that he had tested five girls, but that none had worked out yet. (Tr. P. 197–199). (emphasis added).

the agents saw Rogers meet briefly with Appellant and then return to his home, where Johnson had been left waiting. Johnson subsequently turned over to the federal agents some 22 grams of heroin, which he had purchased from Rogers.

On January 29, 1973, Johnson contacted BNDD agents for the fourth time regarding the heroin activities of Rogers. The agents again placed Rogers under surveillance, following him as he proceeded to drive Johnson's automobile into Portland. In the early hours of the next morning, Rogers was observed checking into a Portland motel. Shortly after Rogers had arrived, Appellant, who was also under surveillance, left his residence and drove toward Rogers' motel. When he reached the motel, he was placed under arrest and a thorough search of his person was conducted. The search revealed two packages, one later determined to contain approximately 25 grams of heroin and the other approximately 6 grams of cocaine. ·

■ Appellant raises a series of issues in this appeal which are sufficiently well-established in this Circuit that we need deal but briefly with them here. First, Appellant contends that his conviction was erroneously based in part upon evidence obtained as a result of illegal eavesdropping by the Government. His contention rests on the argument that a motel room is in essence a bedroom, to which society attaches significant rights of privacy. *See* Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L. Ed.2d 668 (1960); Griswold v. Connecticut, 381 U.S. 479, 485–486, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). This general proposition, it is argued, supports Appellant's assertion that all discussion which occurs in a bedroom should therefore be fully protected by the courts. We cannot agree, and hold that the evidence was admissible under our decision in United States v. Fisch, 474 F.2d 1071 (9th Cir., 1973). *See also,* Ponce v. Craven, 409 F.2d 621 (9th Cir., 1969); Hunter v. United States, 339 F.2d 425 (9th Cir., 1964).

Next Appellant asserts that there was insufficient evidence to establish either a conspiracy or the intent necessary to uphold a conviction under 21 U.S.C. § 841(a)(1). However, Appellant's reliance on this Court's decision in United States v. Spanos, 462 F.2d 1012 (9th Cir., 1972), and the holding in United States v. Peoni, 100 F.2d 401 (2d Cir., 1938), is misplaced.

■■ As an initial matter, we note that evidence of a conspiracy will usually be circumstantial given the nature of the crime, *see e. g.,* White v. United States, 394 F.2d 49, 51 (9th Cir., 1968); Diaz-Rosendo v. United States, 357 F.2d 124, 129 (9th Cir., 1966), cert. denied, 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966), and that each case must be evaluated on its own particular set of facts, Diaz-Rosendo v. United States, *supra* at 130.

Viewing the evidence in the light most favorable to the Government, *see e. g.,* Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Cape v. United States, 283 F.2d 430 (9th Cir., 1960), the finder of fact could well conclude that the distribution and attempted distribution of approximately 3 ounces of heroin and 6 grams of cocaine were of wholesale amounts for redistribution by Rogers.[3] The finder of fact could also conclude that Appellant, as a

---

3. Taken in ·the light most favorable to the Government, the finder of fact could conclude that Appellant had made or was in the process of making distributions of heroin on four occasions to Rogers totalling approximately 3 ounces of heroin and 6 grams of cocaine. Testimony in the record also revealed that the approximately 25 grams of heroin found on Appellant's person at the time of his arrest would have a wholesale value of $1,200, would make 120 individual doses for a heroin addict and would have a street value of several thousand dollars. (Tr. pp. 224, 233). The 5.8 grams of cocaine was worth approximately $600, would make over 100 individual doses for a user and would last the normal user up to four weeks. (Tr. p. 222–224).

wholesale distributor of narcotics, had an interest in Rogers' success in redistributing the heroin which appellant had supplied. *See e. g.*, Valentine v. United States, 293 F.2d 708 (8th Cir., 1961); United States v. Rich, 262 F.2d 415 (2d Cir., 1959); United States v. Tramaglino, 197 F.2d 928 (2d. Cir., 1952); United States v. Bruno, 105 F.2d 921 (2d Cir.) rev'd on other grounds 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939).

In United States v. Peoni, *supra,* the court was confronted with a single sale of counterfeit bills which were then resold to a third party. Aside from Appellant's mistaken attempt to analogize the showing necessary to establish a conspiracy to commit a crime which is totally unrelated to the underlying offense charged here, *see* United States v. Rich, *supra* at 417, the Second Circuit has clearly distinguished its holding in *Peoni* where a "chain" conspiracy to distribute drugs is involved. United States v. Agueci, 310 F.2d 817 (2d Cir., 1962). As the court in that case noted, in contrasting *Peoni* with United States v. Bruno, *supra:*

> In *Bruno* the evidence sufficed to warrant the jury's finding that the defendants knew remote links must have existed. In *Peoni* they did not. Had the prosecution been able to establish more than one sale from Peoni to Regno, the inference that Peoni knew that sales beyond his own would be made, and that he thus shared a common purpose with Dorsey as Regno's vendee, might well have warranted submission to the jury. United States v. Agueci, *supra* at 827.

Similarly, in United States v. Spanos, *supra,* this Court was faced with a single sale of amphetamines which we viewed as falling within the "very narrow field" to which *Peoni* applies. The defendant in *Spanos* had subsequently refused to sell additional quantities of pills to the Government informer, and thus no reliance upon the purchaser's business could be shown. Because the purchaser was not shown to have been one upon whom the success of Spanos' dealership depended, no common purpose was established and therefore no conspiracy existed. *Spanos, supra* at 1017–1018 (concurring opinion). In the instant case, Appellant engaged in multiple sales over a relatively brief period while actively encouraging Rogers to expand the volume of his business. Under these facts a conspiracy has been established.[4]

■ As a final ground for appeal, Sin Nagh Fong contends that his conviction should be reversed because the Government failed to produce the informer, Johnson, for defense counsel to interview as a potential witness. It is not disputed that Appellant knew the identity of the informer, and that if he had not the government might well have been required to disclose his identity under Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The sole issue before this Court is thus whether the Government should have been required to demonstrate, under our holding in Velarde-Villarreal v. United States, 354 F.2d 9 (9th Cir., 1965), that it had neither taken steps to insure that Johnson would be unavailable as a witness nor failed to make reasonable efforts to produce him.

In *Velarde-Villarreal,* we were faced with a situation in which the defendant had presented a "typical case of entrapment" and there was testimony suggesting that Government agents were directly responsible for the informer's disappearance. Under the facts then before us, the defendant had no prior criminal record, had engaged in but a single sale of narcotics, and the sole witness who could testify as to his entrapment de-

---

4. The discussion overheard by the agents between Appellant and Rogers supports the finding that Appellant had knowledge that Rogers was purchasing for redistribution. Multiple-sales, coupled with Appellant's attempts to encourage further purchases, only bolsters the conclusion that Appellant had a stake in the success of Rogers' activities.

fense was the missing informer. In distinguishing Washington v. United States, 275 F.2d 687 (5th Cir., 1960), we noted that:

> . . . the defendant [in *Washington* had] made no showing of entrapment. He had made prior sales of narcotics. He did not hesitate in making the sale there in question. . . . The heroin was in his own possession. He complained he was not getting enough narcotics purchasers, and objected to his customers buying from others. 354 F.2d at 12.

Viewed in its context, we determined that *Velarde-Villarreal* was a *"special case* in which the Government should be required to demonstrate its inability through reasonable efforts to produce [the informer]" (emphasis added). *Id.* at 13.

In the instant case, no such basis exists for placing an affirmative burden of proof on the Government. While Johnson's testimony may have been relevant and material, requiring disclosure of his identity under *Roviaro, supra,* there has been no entrapment defense raised. Further, Appellant has prior convictions for narcotics violations, there has been no showing that the Government was in any way responsible for Johnson's absence and there is no indication that the informer was even present when the narcotics transactions took place. Absent the kind of special facts before us in *Velarde-Villarreal,* we do not feel that the Government has an affirmative duty to produce the informer. *See e. g.,* Wilson v. United States, 409 F.2d 184 (9th Cir., 1969); Clingan v. United States, 400 F.2d 849 (5th Cir., 1968); United States v. Cimino, 321 F.2d 509 (2d Cir., 1963); Williams v. United States, 273 F.2d 781 (9th Cir., 1959); Eberhart v. United States, 262 F.2d 421 (9th Cir., 1958).

Judgment is affirmed.

BROWNING, Circuit Judge, concurs in the result.