UNITED STATES of America,
Plaintiff-Appellee,

v.

Clayton FOUNTAIN, Thomas E. Silverstein, and Randy K. Gometz,
Defendants-Appellants.

Nos. 84–1939, 84–1940 and 84–1949.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1985.
Decided July 8, 1985.

792

Frederick J. Hess, U.S. Atty., East St. Louis, Ill., Michael C. Carr, U.S. Atty., Benton, Ill., for plaintiff-appellee.

David R. Freeman, Fed. Pub. Defender, St. Louis, Mo., Howard B. Eisenberg, So. Ill., Univ. School of Law, Carbondale, Ill., Thomas Day, Fed. Pub. Defender Ofc., St. Louis, Mo., for defendants-appellants.

Before WOOD and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

We have consolidated the appeals in two closely related cases of murder of prison guards in the Control Unit of the federal penitentiary at Marion, Illinois—the maximum-security cell block in the nation's maximum-security federal prison—by past masters of prison murder, Clayton Fountain and Thomas Silverstein.

Shortly before these crimes, Fountain and Silverstein, both of whom were already serving life sentences for murder, had together murdered an inmate in the Control Unit of Marion, and had again been sentenced to life imprisonment. See *United States v. Silverstein*, 732 F.2d 1338 (7th Cir.1984). After that, Silverstein killed another inmate, pleaded guilty to that murder, and received his third life sentence. At this point Fountain and Silverstein had each killed three people. (For one of these killings, however, Fountain had been convicted only of voluntary manslaughter. And Silverstein's first murder conviction was reversed for trial error, and a new trial ordered, after the trial in this case.) The prison authorities—belatedly, and as it turned out ineffectually—decided to take additional security measures. Three guards would escort Fountain and Silverstein (separately), handcuffed, every time they left their cells to go to or from the recreation room, the law library, or the shower. (Prisoners in Marion's Control Unit are confined, one to a cell, for all but an hour or an hour and a half a day, and are fed in their cells.) But the guards would not be armed; nowadays guards do not carry weapons in the presence of prisoners, who might seize the weapons.

The two murders involved in these appeals took place on the same October day in 1983. In the morning, Silverstein, while being escorted from the shower to his cell, stopped next to Randy Gometz's cell; and while two of the escorting officers were for some reason at a distance from him, reached his handcuffed hands into the cell. The third officer, who was closer to him, heard the click of the handcuffs being released and saw Gometz raise his shirt to reveal a home-made knife ("shank")—which had been fashioned from the iron leg of a bed—protruding from his waistband. Silverstein drew the knife and attacked one of the guards, Clutts, stabbing him 29 times and killing him. While pacing the corridor after the killing, Silverstein explained that "this is no cop thing. This is a personal thing between me and Clutts. The man disrespected me and I had to get him for it." Having gotten this off his chest he returned to his cell.

Fountain was less discriminating. While being escorted that evening back to his cell from the recreation room, he stopped alongside the cell of another inmate (who, however, apparently was not prosecuted for his part in the events that followed) and reached his handcuffed hands into the cell, and when he brought them out he was out of the handcuffs and holding a shank. He attacked all three guards, killing one (Hoffman) with multiple stab wounds (some inflicted after the guard had already fallen), injuring another gravely (Ditterline, who survived but is permanently disabled), and inflicting lesser though still serious injuries on the third (Powles). After the wounded guards had been dragged to safety by other guards, Fountain threw up his arms in the boxer's gesture of victory, and laughing walked back to his cell.

A jury convicted Fountain of first-degree murder, 18 U.S.C. § 1111, and of lesser offenses unnecessary to go into here. The judge sentenced him to not less than 50 nor more than 150 years in prison, and also ordered him, pursuant to the Victim and Witness Protection Act of 1982, Pub.L. 97–291, 96 Stat. 1248 (codified in 18 U.S.C. §§ 3579–3580 and elsewhere), to make restitution of $92,000 to Hoffman's estate, $98,000 to Ditterline, and nearly $300,000 to the Department of Labor. The money for the Department was to reimburse it for disability, medical, and funeral payments that it had made or would make to Ditterline, Powles, and Hoffman's estate. The money for Ditterline was to compensate for past and future lost earnings not compen-

sated for by the Department of Labor and for unreimbursed medical expenses.

Silverstein and Gometz were tried together (also before a jury, and before the same judge who presided at Fountain's trial) for the murder of Clutts, and both received the same 50 to 150 year sentences as Fountain and were ordered to pay restitution to Clutts's estate and to the Department of Labor of $68,000 and $2,000 respectively. Fountain and Silverstein are now confined in different federal prisons, in what were described at argument as "personalized" cells.

The appeals involve challenges to rulings at trial; Gometz's challenge to the sufficiency of the evidence; and, of particular interest, the defendants' challenges to the sentences.

■ 1. At both trials the judge ordered the defendants and their inmate witnesses to be shackled at the ankles while in court. Curtains at the counsel tables shielded the defendants' shackles from the jury's view but apparently the shackles were visible when witnesses were en route to or from the witness stand; and Fountain and Silverstein each testified in his own trial. Although disfavored for obvious reasons, the shackling of inmate witnesses in a jury trial is permissible *in extremis.* See, e.g., *Harrell v. Israel,* 672 F.2d 632, 635–36 (7th Cir.1982) (per curiam), and cases cited there. The prudence of requiring shackles in this case was shown by Fountain's and Silverstein's extraordinary history of violence in the face of maximum security precautions, the fact that most of the witnesses were murderers, and above all the fact that, as we shall explain when we discuss the sentencing issues, the defendants are wholly beyond the deterrent reach of the law. If they were not shackled, there would be a grave danger of their attacking people in the courtroom or trying to escape. Silverstein's long disciplinary record includes one escape, while Gometz's includes three episodes of planning and attempting escape. The prejudice caused by shackling was mitigated by the jury's awareness that the entire *dramatis perso-*

*nae* in the two cases were prison inmates—most of them murderers—and guards. The shackles could not have come as much of a surprise. The judge did not abuse his discretion in requiring them.

■ On the day of trial Silverstein's lawyer requested the judge to appoint a psychiatrist. The judge refused, saying, "I don't think that is within my prerogative to do that and the court would not grant a continuance at this late date for that." Silverstein points out that the judge was wrong to think—if that is what he did think—that he had no power to appoint a psychiatrist (see 18 U.S.C. § 3006A(e)), even on the eve of trial. It is true that Rule 12.2 of the Federal Rules of Criminal Procedure requires a defendant who wants to make an issue of his mental condition and present expert testimony on the issue to notify the government within specified time limits that were exceeded here, but the court can allow late notice "for cause shown." It is also true that Silverstein's defense was to be, not insanity, but self-defense or compulsion, and he wanted the psychiatrist to testify about the effects on his psyche of what he contends was Clutts's harassment of him. But this is not an improper forensic use of psychiatry. Cf. Rule 12.2(b). The court can always, for cause, on the eve of trial or for that matter during trial, amend the witness list or appoint an expert witness for an indigent defendant, as Silverstein was.

■ But we would be reading the transcript of the judge's oral ruling with too jaundiced an eye if we held that he failed to exercise his discretion because he didn't realize he had any. It is more likely that the judge meant that since Silverstein had given no good reason why his request for a psychiatrist came so very late in the day, and since the proposed use of the psychiatrist was sufficiently unusual to require a fuller explanation of why it justified postponing the trial, the judge was not required to grant a continuance in order to follow up this will o' the wisp. The last-minute grant of a continuance can cause serious inconvenience to judge, jury, oppos-

ing counsel, witnesses, and other litigants. The denial of a request for one will rarely be upset on appeal. See, e.g., *United States v. Solina*, 733 F.2d 1208, 1211 (7th Cir.1984).

On direct examination Silverstein's lawyer asked him whether he had been convicted of various crimes, including two murders, and Silverstein answered "yes." On cross-examination the prosecutor asked the same questions but in more detail (e.g., "March 3rd, 1980, United States Penitentiary at Leavenworth, you killed an inmate, didn't you?"), ending with, "You are a peaceable man?"—to which Silverstein answered, "I like to think so." Silverstein concedes that his prior convictions were admissible to challenge his credibility as a witness, see Fed.R.Evid. 609(a)(1), but argues that the prosecutor's harping on those convictions in cross-examination and ending with a sarcastic question about peaceableness made the cross-examination unnecessarily prejudicial.

■ We do not think the prosecutor dwelt on Silverstein's prior crimes in too great detail. The questions on direct examination about prior crimes had been perfunctory and the prosecutor was entitled to amplify them slightly, which is all he did. In previous cases in which error has been found in the prosecutor's inquiring about the details of an admitted crime, see 3 Weinstein & Berger, Weinstein's Evidence ¶ 609[05], at p. 609–86 n. 13 (1982), the prosecutor had harped at greater length and in fuller detail on the particulars of the prior crimes.

■ But the question whether Silverstein is a "peaceable man" was not a proper question with which to challenge his credibility. Violent men are not necessarily liars, and indeed one class of violent men consists of those with an exaggerated sense of honor. Now Silverstein had testified on direct examination that he had killed Clutts because Clutts was planning to let Cubans out of their cells to kill him, and on cross-examination had added that he hadn't been "out to hurt anybody or anything." If this statement could be con-

strued as putting the peaceableness of his character in issue, then he laid himself open to cross-examination designed to show the violence of his character. See Fed.R. Evid. 404(a)(1); *United States v. Jordan*, 722 F.2d 353, 358 (7th Cir.1983). It can be argued that by testifying that he hadn't intended to hurt anybody Silverstein was claiming to have a peaceable character, and if so the prosecutor's question was proper. But the argument is a weak one. To deny that one intended harm on a particular occasion is not to claim a generally peaceable character. And it cannot be right that merely by claiming self-defense (which probably is all that Silverstein meant to do in saying that he had not intended to hurt anybody or anything) a defendant puts his whole character in issue; that would make mincemeat of the limitations in Rule 404(a) on the use of character evidence.

■ But a more realistic view of the question about Silverstein's peaceable character is that it was said in jest—ill-timed but completely harmless. It was obvious to the jury both that Silverstein's character is not peaceable and that he did not have a good defense of self-defense even if he honestly and reasonably thought (which is itself nearly inconceivable) that Clutts was about to loose a bunch of murderous Cubans on him. Silverstein's counsel acknowledges that "the explanation given by the defendant for his conduct was certainly inadequate in a reasonable person's mind to justify the slaying of a prison guard." The menace was not imminent enough to justify killing Clutts, especially when Silverstein had an alternative remedy—to complain to the other guards. For he made clear after killing Clutts that he had had no grievance against them; he must therefore not have thought that they had been in cahoots with Clutts to loose the Cubans on him. These points are related; the reason for limiting the right of self-defense to cases of imminent danger is that if the danger is more remote the potential victim can invoke the aid of the authorities. See, e.g., LaFave & Scott, Handbook on Criminal Law § 53, at

p. 394 (1972). Lethal self-help is a last resort.

▮▮▮ Fountain at his trial testified that he too had been acting in self-defense when he attacked his guards; and while he admitted that he had had a knife, he testified that it was for self-defense. This testimony laid him open to the cross-examination of which he complains: an inquiry about his prior activities with a knife, which included killing an inmate whom he stabbed 57 times, crying "die, bitch, die." This evidence does not have the infirmity of the question about Silverstein's character. Fountain made an issue of his purpose in having a knife; and evidence that his previous use of a knife in prison was for attack rather than defense was relevant to cast doubt on his stated purpose. Prior wrongful acts can be put in evidence to illuminate intent and *modus operandi.* Fed.R.Evid. 404(b). If Silverstein had previously attacked prison staff, this might have been admissible on the issue of his intent in attacking Clutts; if he had used a shank before, then like Fountain he could have been cross-examined about that prior use. But just by claiming self-defense one does not open up one's entire character to attack on cross-examination.

Fountain complains about the court's refusal to subpoena as witnesses inmates Bruscino and Gometz. He says they would have contradicted a guard who testified that Fountain, shortly after the murder, had told Bruscino, who was in the second cell down the corridor from Fountain (Gometz was in the cell between them), that "it would have been fun if he [Fountain] could have killed Hoffman, Jr."—the son of the guard Fountain had killed, and also a guard at Marion. The judge said, "the fact that somebody else such as Gometz and Bruscino would say that they didn't hear it, I don't think is probative of the fact that it was said or not said. And Mr. Fountain knows whether it was said or not said, and he can deny it or not and that will be up to him. . . . The Court finds itself in this position to some extent, that I notice that these witnesses repeatedly are called for almost every case, when any one of them are involved. The Court is extremely skeptical about the veracity of all of them and I am somewhat prone to believe that they testify and are willing to testify favorable to their friends on whatever occasion the circumstances require."

▮▮▮ Although the judge could not properly refuse to subpoena witnesses "necessary to an adequate defense"—the test under Rule 17(b) of the Federal Rules of Criminal Procedure for whether the court must subpoena a witness for an indigent defendant (as Fountain was)—merely because *he* thought they would lie, we do not think this was the judge's ground for refusing; it was an observation made in passing. The ground was lack of necessity. The fact that Gometz may not have overheard a conversation between Fountain and Bruscino was not strong evidence that no such conversation had taken place. All the inmates in the Control Unit are in different cells, and it cannot be that Gometz hears *all* the chatter that goes on between other cells. Bruscino, however, was the other party to the conversation with Fountain about which the guard testified. The fact that Fountain (who the judge knew intended to take the stand) would deny the conversation would carry little weight with a jury; and the failure of the other party to the alleged conversation to testify for Fountain would further enhance the guard's credibility.

▮▮▮ But we think it was a permissible judgment—at least in hindsight, which seems the proper perspective when deciding whether reversible error has occurred—that Bruscino's presence was unnecessary to an adequate defense. Necessary implies at the most vital (cf. *United States v. Duggan,* 743 F.2d 59, 82 n. 8 (2d Cir.1984); *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982)), at the least helpful (see *United States v. Barker,* 553 F.2d 1013, 1020 (6th Cir.1977)); and testimony that could not reasonably be expected to make a difference to the outcome of the trial is not necessary in either sense.

Bruscino's long criminal record, which includes an assault on a guard, see *United States v. Solina, supra,* as well as the murder of an inmate, see *United States v. Bruscino,* 687 F.2d 938 (7th Cir.1982) (en banc)—all of which would have been brought out on cross-examination—makes it most unlikely that the jury would have believed him. Cf. *United States v. Solina, supra,* 733 F.2d at 1212–13. And if it had believed him, still the case against Fountain, even without the conversation, was overwhelming. This is so even if we indulge the further and speculative assumption that had the jury believed Bruscino and hence disbelieved the guard it would have paid less heed to the other government witnesses.

■ The important thing, in short, is not that the judge thought that Bruscino would lie (though he did think this) but that the jury would have thought so and that even if it had believed Bruscino it would not have acquitted Fountain. The same is true even more clearly with regard to the judge's refusal to subpoena Gometz. We recognize the danger of using the requirement that the subpoenaed witness be "necessary to an adequate defense" to prevent the clearly guilty defendant who is indigent from putting on any defense at all. But we shall worry about such a case when it arises. The court subpoenaed five inmate witnesses at Fountain's request. Given the security problems that such witnesses pose—the practice of "writting" prisoners around the country to testify as witnesses in other prisoners' cases figured in one of Silverstein's previous murders, see *United States v. Silverstein, supra,* 732 F.2d at 1342—the court was entitled to make Fountain limit his request. If Bruscino was so important to his case, Fountain could have dropped one of the other five. He was not entitled to empty Marion's Control Unit into the courtroom.

■ Fountain also objects to testimony by a guard that two months after the murder Fountain had said to him, "what are you looking at, bitch?," and then asked him whether, when it was his turn to die, he "would scream like the other two bitches screamed." Fountain argues that the alleged conversation was irrelevant and that it wasn't even shown that he knew that another guard had been killed the day he murdered Hoffman. Yet Fountain testified that he knew of Clutts's murder the same day it happened. The government argues that it can be inferred from the conversation itself that Fountain had learned of Clutts's death through the always efficient prison grapevine (or from Gometz, who according to Fountain was in a position to overhear his conversations and therefore to communicate with him). Thus the reference to the "two bitches" could be interpreted as an admission that Fountain had killed Hoffman. The problem with this argument is that Fountain's killing of Hoffman was never an issue; the issue was whether he had killed him in self-defense; and the conversation was not an admission that he had not been acting in self-defense. It was however evidence of hostility to Marion guards, suggesting a motive other than self-defense for Fountain's killing of Hoffman, and hence admissible after all. At all events, any error was a harmless one; the circumstances of Fountain's mad-dog attack on three guards negated any inference of self-defense.

The defendants did not get a perfect trial, but they got a fair trial. That was all they were entitled to.

2. Gometz argues that the evidence was insufficient to convict him of aiding and abetting Silverstein in murdering Clutts. This argument requires us to consider the mental element in "aiding and abetting," on which see the useful discussions in La-Fave & Scott, *supra,* § 64, pp. 505–12, and Perkins & Boyce, Criminal Law 745–48 (3d ed. 1982). Under the older cases, illustrated by *Backun v. United States,* 112 F.2d 635, 636–37 (4th Cir.1940), and *Bacon v. United States,* 127 F.2d 985, 987 (10th Cir. 1942), it was enough that the aider and abettor knew the principal's purpose. Although this is still the test in some states (see, e.g., *Sanders/Miller v. Logan,* 710 F.2d 645, 652 (10th Cir.1983)), after the

Supreme Court in *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949), adopted Judge Learned Hand's test—that the aider and abettor "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed," *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)—it came to be generally accepted that the aider and abettor must share the principal's purpose in order to be guilty of violating 18 U.S.C. § 2, the federal aider and abettor statute. See, e.g., *United States v. Paone*, 758 F.2d 774, 775–76 (1st Cir.1985). But as both LaFave & Scott (at p. 509) and Perkins & Boyce (at p. 746) point out, there is support for relaxing this requirement when the crime is particularly grave. The holding of *Backun* itself may have been superseded, but a dictum in *Backun*—"One who sells a gun to another knowing that he is buying it to commit a murder, would hardly escape conviction as an accessory to the murder by showing that he received full price for the gun," 112 F.2d at 637—makes so compelling an appeal to common sense that Gometz's opening brief in this court, after quoting the dictum, states, "Defendant Gometz has no quarrel with this rule of law."

■ In *People v. Lauria*, 251 Cal. App.2d 471, 481, 59 Cal.Rptr. 628, 634 (1967)—not a federal case, but illustrative of the general point—the court, en route to holding that knowledge of the principal's purpose would not suffice for aiding and abetting of just any crime, said it would suffice for "the seller of gasoline who knew the buyer was using his product to make Molotov cocktails for terroristic use." See also *Nash v. Israel*, 707 F.2d 298, 303 n. 8 (7th Cir.1983). Compare the following hypothetical cases. In the first, a shopkeeper sells dresses to a woman whom he knows to be a prostitute. The shopkeeper would not be guilty of aiding and abetting prostitution unless the prosecution could establish the elements of Judge Hand's test. Little would be gained by imposing criminal liability in such a case. Prostitution, anyway a minor crime, would be but

trivially deterred, since the prostitute could easily get her clothes from a shopkeeper ignorant of her occupation. In the second case, a man buys a gun from a gun dealer after telling the dealer that he wants it in order to kill his mother-in-law, and he does kill her. The dealer would be guilty of aiding and abetting the murder. This liability would help to deter—and perhaps not trivially given public regulation of the sale of guns—a most serious crime. We hold that aiding and abetting murder is established by proof beyond a reasonable doubt that the supplier of the murder weapon knew the purpose for which it would be used. This interpretation of the federal aider and abettor statute is consistent with though not compelled by precedent; for ambivalent discussions which however provide some support for our interpretation see *United States v. Wilson*, 665 F.2d 825, 830 (8th Cir.1981); *United States v. Clayborne*, 509 F.2d 473, 480–81 (D.C.Cir.1974); *United States v. Eberhardt*, 417 F.2d 1009, 1013 (4th Cir.1969).

■ Gometz argues that there is insufficient evidence that he knew why Silverstein wanted a knife. We disagree. The circumstances make clear that the drawing of the knife from Gometz's waistband was prearranged. There must have been discussions between Silverstein and Gometz. Gometz must have known through those discussions or others that Silverstein had already killed three people in prison—two in Marion—and while this fact could not be used to convict Silverstein of a fourth murder, it could ground an inference that Gometz knew that Silverstein wanted the knife in order to kill someone. If Silverstein had wanted to conceal it on his person in order to take it back to his cell and keep it there for purposes of intimidation, escape, or self-defense (or carry it around concealed for any or all of these purposes), he would not have asked Gometz to release him from his handcuffs (as the jury could have found he had done), for that ensured that the guards would search him. Since the cuffs were off before Silverstein drew the shank from Gometz's waistband, a reasonable

jury could find beyond a reasonable doubt that Gometz knew that Silverstein, given his history of prison murders, could have only one motive in drawing the shank and that was to make a deadly assault.

3. The federal murder statute does not provide for a term of years for first-degree murder. "Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment,' in which event he shall be sentenced to imprisonment for life." 18 U.S.C. § 1111(b). Since the provision for capital punishment was held unconstitutional in the wake of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam); see *United States v. Shepherd*, 576 F.2d 719, 727–29 (7th Cir.1978); *United States v. Kaiser*, 545 F.2d 467, 470–75 (5th Cir. 1977), the punishment for first-degree murder is life, see *id.* at 474–75. The district judge was troubled, however, by the fact that someone sentenced to life in prison can be paroled after only 10 years. See 18 U.S.C. § 4205(a) ("Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term or terms or after serving ten years of a life sentence or of a sentence of over thirty years, except to the extent otherwise provided by law"). It does not matter how many federal life sentences the prisoner already is serving. The federal prison and parole authorities, in an interpretation of section 4205(a) that has not to our knowledge been questioned, refuse to "stack" beyond 30 years prison sentences of any length—even when imposed consecutively—for purposes of determining the date of eligibility for parole. See U.S. Dept. of Justice, U.S. Parole Comm'n, Rules and Procedures Manual § 2.5 (Oct. 1, 1984); U.S. Dept. of Justice, Federal Prison System, Program Statement No. 5050.9, at p. 2 (May 21, 1979). You could be sentenced to ten consecutive life sentences and you would still be eligible for parole after 10 years, though the likelihood of parole then would be slight.

That is why the judge imposed a term of years (minimum 50, maximum 150) instead of life. But we are not clear how the judge thought this form of sentence would affect the defendants' parole eligibility dates, when as we have said section 4205(a) requires that every sentence of more than 30 years be treated, for purposes of computing that date, as if it were a sentence of 30 years. If the defendant is already serving time under a sentence of 30 years or more, an additional sentence will not postpone the date. True, the next subsection allows the judge to "designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court." 18 U.S.C. § 4205(b)(1). But the apparent purpose is to allow release on parole before the earliest date allowed by subsection (a); we have found no case where it was used to postpone the date of eligibility for parole. Cf. 3 Wright, Federal Practice and Procedure: Criminal § 536, at pp. 183–84 (2d ed. 1982). There is authority it cannot be so used. See *United States v. Smith*, 703 F.2d 627, 628 (D.C.Cir.1983) (per curiam); *United States v. Pry*, 625 F.2d 689, 692 (5th Cir. 1980) (per curiam).

In any event, the federal murder statute makes no provision for sentencing a first-degree murderer to a term of years. This is the reason for what the judge regarded as the intolerable anomaly that second-degree murder, being punishable by imprisonment "for any term of years or for life," 18 U.S.C. § 1111(b), could be punished more severely than first-degree murder, and is what led the judge to impose a term of years anyway. There is no anomaly if as we have suggested section 4205(b)(1) does not allow the sentencing judge to use a term of years to postpone the parole eligibility date beyond 10 years; but the more important point is that judges have no authority to add to the criminal penalties provided in federal statutes. Section 1111(b) provides, in the case of first-de-

gree murder, for death or for life in prison; and with death in effect struck out of the statute, life is the only punishment possible. There is no ambiguity in the statute that would give the district judge or us a purchase for allowing a term of years to be imposed instead. As the judge had no discretion to sentence the defendants to other than life imprisonment, their prison sentences must be vacated with directions to sentence them to life in prison.

The last issue, and the hardest, is restitution, on which see the useful discussion in Note, *Victim Restitution in the Criminal Process: A Procedural Analysis*, 97 Harv. L.Rev. 931 (1984). The relevant provisions of the Victim and Witness Protection Act of 1982 authorize the sentencing judge, as part of the sentence for a crime resulting in bodily injury or death, to order that the defendants pay the victim's funeral, medical, and related expenses (including expenses for therapy and rehabilitation) and make reimbursement "for income lost by such victim as a result of such offense," with payment to go to the estate if the victim has died. 18 U.S.C. §§ 3579(b)(2)–(4), (c). Restitution may also be ordered "to any person who has compensated the victim" for a loss resulting from the crime. § 3579(e)(1). Restitution creates a set-off in any subsequent tort action brought by the victim, § 3579(e)(2); shall be determined after conviction in a proceeding where the court "shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate," § 3580(a); see also §§ 3580(b)–(d); and shall not be ordered if the order would "unduly complicate or prolong the sentencing process," § 3579(d).

The defendants argue that the statute is unconstitutional, because it allows a victim of crime to obtain from the sentencing judge what amounts to a judgment for tort damages, thus thwarting the defendant's Seventh Amendment right to trial by jury in any federal suit at law in which the stakes exceed $20. The argument is unpersuasive when pushed to the extreme of saying that *any* order that a criminal defendant pay a victim money for which the victim could get a judgment in a suit at law is a judgment at law for purposes of the Seventh Amendment. If by "restitution" in criminal law (a distinct concept from civil restitution) we mean simply an order in a criminal case that the criminal restore to his victim what he has taken from him, we are speaking of a form of criminal remedy that predates the Seventh Amendment. Restitution indeed is the earliest criminal remedy. Before there is organized government, criminal misconduct is punished by forcing the criminal to compensate the victim or the victim's family. See, e.g., Diamond, Primitive Law Past and Present 58–59, 65, 66, 269–70 (1971); Rubin, The Law of Criminal Correction, ch. 7, § 1 (2d ed. 1973). Even after the rise of the state we find restitution used as a criminal remedy, as in an English statute of 1529 that empowered the court, upon finding someone guilty of robbery, to issue a "writ of restitution" ordering the robber to restore the thing taken to its owner. 21 Hen. 8, ch. 11 (1529), 19 Viner, A General Abridgment of Law and Equity 153–56 (2d ed. 1793), quoted (with incorrect date) in Note, *The Unconstitutionality of the Victim and Witness Protection Act Under the Seventh Amendment*, 84 Colum.L.Rev. 1590, 1595 n. 27 (1984).

The question is, what does restitution as a criminal remedy comprehend? As the word implies and history confirms, the original conception is that of forcing the criminal to yield up to his victim the fruits of the crime. The crime is thereby made worthless to the criminal. This form of criminal restitution is sanctioned not only by history but also by its close relationship to the retributive and deterrent purposes of criminal punishment. The fact that tort law may also have deterrent purposes, see, e.g., *Jones v. Reagan*, 696 F.2d 551, 554 (7th Cir.1983), does not make every payment to the victim of crime a tort sanction; it just shows that tort and criminal law overlap.

In fact their differentiation is a relatively modern development. See, e.g., *I. de S. & Wife v. W. de S.*, Y.B. Liber Assisarum, 22 Ed. 3, f. 99, pl. 60 (1348 or 1349).

An order to make restitution of medical and funeral expenses and lost earnings has a weaker connection with the traditional purposes of criminal law. But since medical expenses are restorative, making the criminal reimburse them can be analogized to forcing him to return stolen goods; so can making him restore any earnings that the victim lost as a result of the crime. The analogy is particularly close where, as in the present cases, the criminal wanted to injure his victim, as distinct from injuring him as merely a byproduct of an acquisitive crime. And with regard to all three types of loss—medical, funeral, and earnings—making the criminal bear them serves a useful purpose in the administration of the criminal law. It brings home to him the enormity of his conduct, by forcing him to pay expenses directly related to his victim's suffering.

That forms of criminal restitution other than ordering stolen goods restored to the owner do not have so clear a historical pedigree does not matter. What matters is that criminal restitution is not some newfangled effort to get around the Seventh Amendment but a traditional criminal remedy; its precise contours can change through time without violating the Seventh Amendment. If Congress creates a new cause of action and does not specify the mode of trial, we must look to the nearest historical analogy to decide whether there is a right of trial by jury. 9 Wright & Miller, Federal Practice & Procedure § 2302, at p. 16 (1971). Here Congress has made clear that the judge rather than the jury is to determine the facts; and its judgment is entitled to our consideration. Moreover, there is a close historical analogy to restitution in a criminal proceeding of the victim's medical and funeral expenses and lost earnings: restitution of stolen goods, an established criminal remedy when the Seventh Amendment was adopted. Restitution is frequently an eq-

uitable remedy, meaning, of course, that there is no right of jury trial. See, e.g., *In re Evangelist*, 760 F.2d 27, 30 (1st Cir. 1985). The Supreme Court has suggested that restitution of back pay under Title VII of the Civil Rights Act of 1964 is an equitable remedy not requiring a jury. See *Curtis v. Loether*, 415 U.S. 189, 197, 94 S.Ct. 1005, 1009, 39 L.Ed.2d 260 (1974). The same, it seems to us, is true of restitution under the Victim and Witness Protection Act of 1982. We therefore join those courts that have upheld under the Act orders for restitution of medical bills, lost wages, and the value of personal property destroyed by the criminal. See, e.g., *United States v. Keith*, 754 F.2d 1388, 1392 (9th Cir.1985), and cases cited there; *United States v. Watchman*, 749 F.2d 616, 617 (10th Cir.1984); *United States v. Brown*, 744 F.2d 905, 908–10 (2d Cir.1984). This conclusion was also reached in Judge Coffey's dissent in *United States v. Gomer*, 764 F.2d 1221, 1228–1229 (7th Cir.1985); the majority opinion did not reach the constitutional issue.

Restitution as a criminal remedy becomes problematic only where it goes beyond the fruits of the crime or the out-of-pocket expenses of the victim or his lost earnings and includes compensation for earnings (in this case, mainly Ditterline's, who was permanently disabled by Fountain's attack on him) that would have been received in the future. Compensation for the loss of future earnings is quintessentially civil. The reason is not merely historical, or conceptual; there is, indeed, no difference of principle between past and future earnings, so far as the purposes of criminal punishment are concerned. To disable a person from working, temporarily or permanently, is to deprive him of his human capital; it is a detail whether the consequence is to deprive him of earnings he would have had in the past or earnings he would have had in the future. The reason for treating past and future earnings differently is practical: the calculation of lost future earnings involves the difficult problem of translating an uncertain future stream of earnings into a present

value. (Compare the limitations on the admiralty remedy of maintenance and cure, on which see Gilmore & Black, The Law of Admiralty 297–310 (2d ed. 1975).) It is not a problem meet for solution in a summary proceeding ancillary to sentencing for a criminal offense.

In the case of guard Ditterline, for example, a responsible calculation of lost future earnings would have required estimating first what Ditterline's salary would have been in each year until his retirement, then the probability that he would actually be alive and working in each of those years, and finally the correct discount rate by which to reduce the estimated future earnings to a present, lump-sum value. See, e.g., *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1198–1201 (7th Cir.1982). The cryptic testimony in the record indicates that some such procedure was gone through by the Department of Labor, which will be guaranteeing Ditterline 75 percent of his salary while he is disabled; but the testimony was conclusional, and its foundations left unexplained and untested. It is not surprising that the district judge did not want to encumber the sentencing process with an elaborate damage calculation requiring expert testimony, but we infer from this not that an arbitrary or unsubstantiated calculation is proper but that projecting lost future earnings has no place in criminal sentencing if the amount or present value of those earnings is in dispute.

■ This does not make the statute unconstitutional, however, or entitle the defendants to a jury trial on the issue of the restitution of their victims' lost future earnings. "Future" is not in the statute. Obeying the statutory directive that "the imposition of such order ... not unduly complicate or prolong the sentencing process," 18 U.S.C. § 3579(d), we hold that an order requiring a calculation of lost future earnings unduly complicates the sentencing process and hence is not authorized by the Victim and Witness Protection Act—unless, to repeat a vital qualification, the amount is uncontested, so that no calculation is required.

■ For reasons already stated, we have no difficulty with the portion of the restitution order that relates solely to the medical and funeral expenses of the victims or the past wages of which they were deprived by the defendants' crimes. Nor do we doubt that the Department of Labor is a "person" within the meaning of the third-party payment provision of the statute. Although the word is not defined in the statute, and the legislative history says that "third parties might include friends, family members, or other individuals and organizations who have assisted the victim or the victim's family, as well as insurance companies and state victim compensation programs," S.Rep. No. 532, 97th Cong., 2d Sess. 33 (1982), U.S.Code Cong. & Admin. News 1982, pp. 2215, 2539—a list that does not appear to include federal agencies—the list is only illustrative; the reference to "organizations" indicates that the word "person" was not intended to be limited to natural persons; and we can think of no reason why a federal agency, alone among third-party payors, natural and institutional, should not be reimbursed if it compensates a victim of crime. See *United States v. Dudley*, 739 F.2d 175, 178 (4th Cir.1984). The Justice Department's Guidelines for Victim and Witness Assistance state merely that federal departments and agencies shall not be considered "victims" for purposes of Part II of the guidelines, which relates to personal services rendered to victims, not money paid to them. See 48 Fed.Reg. 33775–76 (July 25, 1983).

■ The defendants complain, finally, that the judge disregarded their poverty in ordering them to pay amounts which, even as reduced to eliminate the substantial payments for lost future earnings, will far exceed the realistic earning capacity of indigent prisoners unlikely ever to be released from prison. But the statute does not say that indigency is a defense, only that it is a factor the judge is required to take into account, 18 U.S.C. § 3580(a), and he did that. The judge was worried that

such accomplished and audacious murderers might have a story to sell to a publisher or broadcaster, and he wanted to make sure they would never reap any gain from their crimes. This is a proper ground for ordering restitution beyond the defendants' present or foreseeable ability to pay. The prospect that these multiple murderers might someday be cashing royalty checks for the stories of their crimes while their victims remain uncompensated for the losses that the murderers inflicted is an insult to the victims and an affront to the society's moral beliefs. It might be too late then for the victims or their survivors to bring wrongful-death actions; the statute of limitations might have run. They could if they want sue now and get a judgment that they could renew till the day (if it ever arrives) when the defendants have money to pay it, but we do not think they should be put to this expense, so likely to be futile.

It is true that the statute, rather than expressly regulating criminals' future earnings from the sale of their stories, directs the Attorney General to study the matter. 96 Stat. 1257. The legislative history indicates that Congress was unsure how to proceed. See S.Rep. No. 532, *supra*, at 42–44. But what Congress deferred was a legislative solution; we do not interpret its irresolution as forbidding district judges to deal with the issue on a case-by-case basis, as was done here. *United States v. Palma*, 760 F.2d 475 (3d Cir.1985), which required the district judge to make findings of fact on the defendant's ability to make restitution, is beside the point. Everyone knows that Fountain and Silverstein cannot *now* make restitution. The point of the order is to make sure that should they ever be able to do so out of earnings from the press or the media, they shall do so. This is a reasonable measure which requires no findings of fact.

■ We do not think the orders of restitution are invalid because of the recent decision of another panel of this court in *United States v. Gomer, supra.* The district judge had failed to consider the financial needs and earning ability of the defendant's dependents, an explicit factor in the statute along with the defendant's own financial situation. See 18 U.S.C. § 3580(a). There is no suggestion in this case that the orders of restitution would burden Fountain's and Silverstein's dependents—indeed, there is no suggestion that they have any dependents—or that it would burden them. They will spend the rest of their lives in prison. All their expenses are paid for. Only if they obtain windfall earnings from the publishing or broadcasting of the story of their criminal activities will the orders of restitution kick in, and they can have no equitable claim to such earnings. In any event, the judge as we have said considered though he rejected their indigency in deciding to order restitution, and in the circumstances that was all the statute required him to do.

■ The statute limits the period within which restitution is due; so far as relevant to this case, the outer limit is five years after the defendant is released from prison. See 18 U.S.C. § 3579(f)(2)(B). Although this limitation is of rather theoretical interest in a case where the defendants are likely to be imprisoned for their natural lives, it should be incorporated in the orders of restitution that the district judge issues on remand after recalculating the amounts in accordance with this opinion.

The defendants' other challenges to their convictions are of no possible merit and require no discussion. To summarize, we affirm the convictions but vacate the sentences and remand the cases for (1) entry of sentences of life imprisonment, (2) recalculation of the restitution awards consistently with the principles laid down in this opinion, (3) inclusion in the awards of a time limit consistent with the statute. We share the sense of frustration that led the judge to impose these unlawful sentences. (When Gometz was sentenced he told the judge: "if you give us a million years, we are still eligible on the ten.") The facts cry out for a federal death penalty for prison murders, or at the very least for increasing the minimum time to eligibility for parole of defendants sentenced to life imprison-

ment—though the forthcoming abolition of federal parole makes the second suggestion largely academic. But these are matters for Congress; our hands are tied by the existing statutes.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

SWYGERT, Senior Circuit Judge, concurring in part and dissenting in part.

I concur with the following holdings: (1) the district court did not err in ordering shackles at trial; (2) the district court did not abuse its discretion in denying as untimely Silverstein's request for a psychiatric examination; (3) the evidence was sufficient to convict Gometz of aiding and abetting Silverstein in murdering Clutts; (4) the district court erred in sentencing all three defendants to a term of years instead of life imprisonment; and (5) the district court erred in failing to place a time limit on the defendants' restitution liability. Although I also agree that the threats uttered by Fountain two months after the homicides were admissible, I do not accept the majority's rationale that the evidence was admissible to establish Fountain's "hostility to Marion guards." *Ante* at 797. The threats could not be used to establish that Fountain acted in accordance with a violent temperament without violating the Federal Rules' prohibition against propensity evidence. *See* Fed.R.Evid. 404(b). Nevertheless, the threats were admissible to establish "intent," *see id.*, in the sense that it is more likely than not that if Fountain had acted out of innocent motives, he would have shown some remorse about the unfortunate necessity of his actions, rather than manifested a violent sense of glee.

I dissent from the court's resolution of three issues. First, I would hold that the Government's cross-examination of Fountain and Silverstein concerning the details of their prior convictions—where neither had offered any character evidence in his behalf and where both had already conceded on direct examination the existence of their prior convictions—was a gross violation of the Federal Rules' prohibition of propensity evidence. *See* Fed.R.Evid. 404. Second, the district court's refusal to allow Fountain to subpoena two inmate witnesses to rebut the incriminating testimony of a Government witness violated Fountain's statutory and constitutional right to compulsory process. Third, I would vacate the restitution sentences in their entirety. The district court erred in failing to make a meaningful inquiry into the financial resources and earning ability of the defendants, as required by statute. *See* 18 U.S.C. § 3580(a) (1982).

I

After Silverstein, on direct examination, admitted his various convictions, the prosecutor cross-examined him about the details of his offenses. It was established that Silverstein's two murder convictions arose from the killings of two fellow inmates, a potentially devastating revelation because it invited the jury to infer that Silverstein had a propensity for prison violence.

Similarly, after Fountain, on direct examination, admitted his prior convictions and testified that he carried a knife to protect himself, the Government, asserting a need to probe about Fountain's violent character and to impeach his credibility, cross-examined Fountain about the details of his prior convictions. Most prejudicial to Fountain's claim of self-defense was his admission that he had stabbed a fellow inmate 57 times while crying "die, bitch, die"—all in "self-defense."

It is important to understand at the outset what Federal Rules of Evidence are *not* involved here. First, Fed.R.Evid. 609 is not at issue. It is uncontested that the Government could impeach the credibility of Silverstein and Fountain by introducing evidence of prior convictions. But Rule 609 does not allow the prosecutor to "probe" into the violent details of those prior crimes. Only the name of the crime, the time and place of conviction, and the punishment are admissible for the purposes of Rule 609. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 609[05] at

609–86 (1982); C. McCormick, *Evidence* § 43 at 98 (3d ed. 1984).

The majority contends that because Silverstein's testimony about his prior crimes was "perfunctory," the prosecutor had the authority, under Rule 609, to "amplify" a bit. Yet, the admission of prior convictions must be "perfunctory." Only the existence of a prior conviction of a serious crime is relevant for assessing credibility. Any embellishment serves no proper purpose; rather it invites the jury to infer that the defendant has a propensity to commit crimes, an inference strictly prohibited by Fed.R.Evid. 404(b). Here, Silverstein had already admitted his murder convictions. To further inform the jury that these murders took place in prison added no further insight to Silverstein's credibility, but merely encouraged the jury to infer that Silverstein had a propensity for prison violence.

Second, Fed.R.Evid. 608(b) is not at issue here. That rule does not allow the prosecution to expand its inquiry beyond that permitted by Rule 609. *See generally* 3 J. Weinstein & M. Berger, *supra*, at § 608[05]. Nor can the Government's cross-examination of Fountain and Silverstein be considered impeachment by contradiction within the meaning of Fed.R.Evid. 607. *See* J. Weinstein & M. Berger, *supra*, at § 607[05]. The cross-examination of both defendants tended to contradict assertions made on direct examination only insofar as a propensity to behave violently could be inferred from the prior crimes. Yet such an inference is prohibited, with some narrow exceptions, by Fed.R.Evid. 404(b).

The inquiry into the violent details of both defendants' prior convictions was only admissible to the extent it was necessary to fulfill the purposes of one of the limited statutory exceptions to the general rule against propensity evidence. *See* Fed.R.Evid. 404, 405. One of the exceptions is the use of character evidence to establish that a person acted in conformance with a character trait. *See* Fed.R.Evid. 404(a), 405. However, the Government can only introduce character evidence to rebut character evidence introduced by the defendant in the first instance. Fed.R.Evid. 404(a)(1). Even the majority concedes that the self-defense claims of Silverstein and Fountain were not assertions of character traits that opened the door to cross-examination about their propensity for violence.

The majority holds that another statutory exception, Fed.R.Evid. 404(b), permitted the prosecutor to cross-examine Fountain about the details of his prior knifing of an inmate: to establish Fountain's "intent." The applicability of this exception was neither argued below nor raised in any of the briefs on appeal. In any event, it is difficult to see how Fountain's prior use of a knife to attack a prisoner impugns his present claim of self-defense. To be sure, one can argue that this establishes a predilection to use knives offensively rather than defensively, but such propensity evidence is precisely what is prohibited by Rule 404(b).

This court has stressed that the "intent" exception to Rule 404(b) is not to be used to circumvent the general prohibition of propensity evidence. *See, e.g., United States v. Chaimson,* 760 F.2d 798, 804 (7th Cir. 1985). Rather, prior crimes may be admissible because the repetition of the crime is itself circumstantial proof of intent, not direct proof of a propensity to commit crime. As Judge Cardozo pointed out in *People v. Gerks,* 243 N.Y. 166, 171, 153 N.E. 36, 38 (1926), repetition affords an "opportunity for reflection and for foresight of the consequences." Thus, a defendant's claim that he did not intend to pass bad checks becomes less credible if it can be shown that he had passed several bad checks previously. *See generally* 2 J. Weinstein & M. Berger, *supra*, at § 404[12] & n. 5. This theory of admissibility is valid only if "the other act is similar enough and close enough in time to be relevant to the matter in issue." *Chaimson,* 760 F.2d at 804 (quoting *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984)). Fountain's use of a knife in the prior incident took place under a

completely different set of circumstances. There are simply too many variables to permit an inference that the second time Fountain used his knife he knew from prior experience that he was exceeding the bounds of his privilege of self-defense, or that, given this knowledge, it was more likely than not that Fountain never intended to defend himself at all.

The majority also holds that the prior knifing was admissible to show a *modus operandi*, which is a "plan" within the meaning of Fed.R.Evid. 404(b). *See generally* 2 J. Weinstein & M. Berger, *supra,* at § 404[16]. Again, this is an issue that is raised *sua sponte* by the court, and again, the argument is meritless in any event because the prior act is not sufficiently similar to satisfy the statute. If the method of operation is "so unusual and distinctive as to be like a signature," then it is more likely than not that repeated uses of the method were the handiwork of the defendant acting with the requisite specific intent. *See id.* at § 404[16](3). That Fountain used a knife in both incidents is not a sufficiently distinctive similarity to establish a *modus operandi*.

In sum, none of the statutory exceptions to the general prohibition against inquiry into the details of a defendant's past crimes is applicable in the case at bar. I would therefore reverse the convictions of Silverstein and Fountain and remand for new trials.

## II

Fed.R.Crim.P. 17(b) requires the district court to subpoena witnesses who are "necessary to an adequate defense." Adopting a narrow, and unprecedented, interpretation of Rule 17(b), the majority holds that the witnesses sought by Fountain were not "necessary" to his defense because their testimony "could not reasonably be expected to make a difference to the outcome of the trial." Such an interpretation ignores Rule 17(b)'s literal requirement that the witnesses need only be necessary to an *adequate* defense, not a winning or dispositive defense. Moreover, the majority con-spicuously omits any reference to the defendant's sixth amendment right "to have compulsory process for obtaining witnesses in his favor." This sixth amendment right is not limited to "important," "necessary," or "vital" witnesses.

Rule 17(b) is a codification of the compulsory process clause, and the federal courts have uniformly interpreted the rule broadly so as to effectuate fully the broad dictates of the sixth amendment. *See, e.g., United States v. Barker,* 553 F.2d 1013, 1019–20 (6th Cir.1977). Accordingly, the courts have held that so long as the testimony of the proposed witness would be relevant and favorable to the defendant, Rule 17(b) requires the district judge to issue the subpoena. *See generally* Westen, *Compulsory Process II,* 74 Mich.L.Rev. 191, 198–234 (1975). Because the defendant must make some "plausible showing" that the proposed testimony will meet this test, *see United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982), the federal courts have upheld denials of a subpoena where the proposed testimony is either inherently incredible or merely cumulative. *Id.; see, e.g., United States v. Solina,* 733 F.2d 1208, 1212–13 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 519, 83 L.Ed.2d 408 (1984); *Greenwell v. United States,* 317 F.2d 108, 110 (D.C.Cir.1963).

Fountain's proposed witnesses would have testified that Fountain had not made the incriminating remarks allegedly overheard by the Government's witness. The majority concedes that this proposed testimony was neither cumulative nor inherently incredible. Because the testimony would have been both relevant and favorable to Fountain's defense, the district judge was required to issue the subpoena. No court has ever required an additional showing that the testimony be necessary or outcome-determinative, for such a requirement would contradict the broad language of the compulsory process clause.

The real issue is not whether error was committed, but whether the error was harmless beyond a reasonable doubt. I am

willing to concede that had Fountain been able to present his witnesses, he would have almost certainly been convicted nevertheless. Therefore, the error was substantively harmless. But the Constitution guarantees something more than substantively correct verdicts. To focus only on the outcome of a trial is to trivialize the procedural rights guaranteed by the Constitution. *Accord* Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale*, 125 U.Penn.L.Rev. 15, 33 (1976) (broad use of harmless error doctrine disparages the notion that the guilty as well as the innocent deserve constitutional protections and encourages circumvention of constitutional rights).

The Supreme Court has stated that some constitutional errors can never be harmless. *Chapman v. California*, 386 U.S. 18, 23 & n. 8, 87 S.Ct. 824, 827 & n. 8, 17 L.Ed.2d 705 (1967). For example, the defendant cannot be denied his right to counsel or his right to an impartial judge simply because the evidence against him is so overwhelming that he will be convicted in any event. *Id.* (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)). Nor has any court ever held that denial of the defendant's sixth amendment right to jury trial can be harmless error. Similarly, it can be argued that the right to compulsory process is a fundamental procedural right that can never be "harmlessly" denied the defendant. In *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), the Supreme Court indicated that the compulsory process right is not only a right in and of itself, but also a necessary adjunct of the right to jury trial: "The right to offer the testimony of witnesses ... is in plain terms ... the right to present the defendant's version of the facts as well as the prosecutor's to the jury so it may decide where the truth lies." If the denial of the defendant's right to jury trial cannot be harmless, then the denial of the necessary adjunct to the right to jury trial also cannot be harmless.

Yet, even this approach to the harmless error question tends to trivialize important procedural rights. It is unwise to distinguish rigidly between rights that can never be subject to harmless error analysis and other rights, for the implication of such a dichotomy is that these "other," somehow less important rights can *always* be subject to harmless error analysis. This dichotomy must be false because the denial of a fair trial can never be harmless, and the defendant can be denied a fair trial on any number of grounds, including a sufficiently grave violation of one of these "other" rights.

I would therefore hold that one member of the set of constitutional rights that the Court in *Chapman* indicated could never be harmless is the fifth amendment right to due process of law. Thus, even if a particular constitutional right is not itself automatically exempt from harmless error scrutiny, it may nevertheless be exempt from such scrutiny if the deprivation of the right is sufficiently grave to deny the defendant due process of law. And one is deprived of due process if the procedural violation is, viewed in the context of the trial as a whole, significant enough to deprive the defendant of a fair trial.

In short, after finding error, the court should always engage in a two-tier inquiry. First, it should determine whether the error is "harmless" in the sense that the defendant will be convicted even if the error is corrected. Second, it should determine whether, in any event, the conviction should be reversed because the error denied the defendant a fair trial.

In the instant case, I would hold that even though the denial of Fountain's compulsory process right was not outcome determinative, it denied him a fair trial. This was not a trivial infraction: the defendant was prevented from rebutting the damaging testimony of a Government witness. I would also reverse and remand for a new trial on this ground.

### III

According to my understanding, the majority adopts a per se rule precluding any

restitution award for lost future earnings where the underlying calculations of such an award are in dispute. The majority reasons that because these calculations would "unduly complicate or prolong the sentencing process," 18 U.S.C. § 3579(d), this kind of restitution award is precluded by statute, *see id.* Such an assumption contradicts both common sense and the intent of Congress. I fail to see why we should conclusively presume that every contested calculation would unduly complicate the sentencing process. Surely there are some victims whose future earnings are easily predictable, and surely district judges have sufficient competence and experience to expeditiously predict future earnings and discount to present value, despite the failure of the parties to agree on the necessary calculations. Furthermore, district judges are in the best position to determine whether a particular calculation in a particular case will unduly complicate the sentencing process. As for the intent of Congress, the majority's per se rule will essentially repeal restitution for lost income provided for in 18 U.S.C. § 3579(b)(2)(C) because all calculations of future income can be "contested."

I would neither reach nor discuss the troubling question of whether the restitution statute is constitutional. Rather, I would vacate the restitution sentences in their entirety because the district judge failed to make the inquiry into the financial resources and earning ability of the defendants required by 18 U.S.C. § 3580(a).

The district judge based the restitution awards solely on his finding that the defendants might sometime in the future sell their life stories to publishers. First, this was mere speculation. The statute requires some principled balancing between the needs of the defendants and the needs of the victims. *See United States v. Gomer*, 764 F.2d 1221, 1223–24 (7th Cir.1985). The district judge did not discharge this duty by awarding over one-half million dollars in restitution simply on the basis of the speculative assertion that the defendants might sell their life stories.

Second, Congress did not intend the restitution statute to apply to those individuals who might conceivably sell their life stories sometime in the speculative future. Otherwise, it would not have included a directive requiring the Attorney General to report on legislation that *would* address this problem. *See* Victim and Witness Protection Act of 1982, Pub.L. No. 97–291, § 7, 96 Stat. 1248, 1257 (reprinted in annotation to 18 U.S.C. § 3579 (1982)). And indeed, the Comprehensive Crime Control Act of 1984 includes precisely such a law. *See* Pub.L. No. 98–473, Title II, § 1406(a), 98 Stat. 1976, 2175–76 (enacting 18 U.S.C. § 3671).\*

Therefore, although I would affirm Gometz' conviction, I would vacate his restitution sentence and remand for resentencing in light of the statutory mandate to make a meaningful inquiry into his financial resources. Because I would reverse the convictions of Silverstein and Fountain and remand for new trials, a similar order with respect to their restitution sentences would be unnecessary.

---

\* To be sure, the statute apparently allows the United States Attorney to seize the proceeds of the life story and apply them to satisfy a restitution sentence, insofar as such a sentence is enforceable as a civil "money judgment" within the meaning of 18 U.S.C.A. § 3671(c)(1)(A)(i) (West 1985). But this assumes that the restitution sentence was properly imposed in the first place—i.e., that the defendant was shown in the first instance to have the present ability to pay or that his future income from a sale of his life story was not merely speculative, as it is in the case at bar. In any event, the instant victims will be able to claim the proceeds if, in lieu of a restitution sentence, they secure a civil tort judgment against the defendants in federal or State court. *See* 18 U.S.C.A. §§ 3671(c)(1)(A)(i), (B)(i) (West 1985).