**UNITED STATES of America, Plaintiff,**

v.

**AMERICAN DIVERSIFIED DEFENSE, INC., and Joel Dale Helms, Jr., Defendants.**

**Civ. A. No. 88–AR–0342–M.**

United States District Court, N.D. Alabama, M.D.

Nov. 14, 1988.

Frank W. Donaldson, U.S. Atty., James G. Gann, III, Asst. U.S. Atty., Birmingham, Ala., for plaintiff.

Joel D. Helms, Jr., Boaz, Ala., pro se.

## MEMORANDUM OPINION

ACKER, District Judge.

Before the court is the motion of plaintiff, United States of America, for summary judgment in the rather sizeable sum of $777,720.00 against defendant, Joel D. Helms, Jr., who is *pro se*. Also before the court is Helms' cross-motion for summary judgment. It is unusual for any court to write an opinion granting summary judgment in favor of a *pro se* litigant and against the United States. This is one of those unusual cases. The pertinent facts are undisputed.

### *Pertinent Undisputed Facts*

On July 31, 1986, the United States filed in this court an indictment against American Diversified Defense, Inc., and Helms in CR 86–PT–211–M. That indictment charged Diversified, a corporation, and

Helms with conspiracy to commit fraud in the production and sale to the government of mortar round fins in violation of 18 U.S.C. §§ 371 and 1001. These are the same basic charges contained in the government's present complaint in the above-entitled cause which, *according to the government's earlier motion for default judgment against Diversified*, is "brought under 31 U.S.C. Section 3729, *et seq.*" Upon Diversified's and Helms' pleas of guilty on October 14, 1986, to certain counts of the indictment in CR 86–PT–211–M, Hon. Robert B. Propst set the matter for a sentencing hearing that was expressly to include a full-scale evidentiary presentation as to the question of the restitution, if any, to be ordered against either of or both defendants pursuant to the Victim and Witness Protection Act, 18 U.S.C. §§ 3663 and 3664 (formerly 18 U.S.C. §§ 3579 and 3980). This court necessarily takes judicial notice of what was said and done during the acceptance of the pleas of guilty. *Inter alia*, the following occurred:

MR. OTT [Assistant United States Attorney]: Your Honor, excuse me. For the record, we also are reserving the right to seek restitution not only as to Mr. Helms, Jr., but as to the corporation as well. In other words, we have full right of allocution to seek that order of restitution.

(Transcript, p. 9, 1. 25, p. 10, 1. 1–4).

   \*    \*    \*    \*    \*    \*

JUDGE PROPST: And do each of you understand that, in addition to that, that you would be subject to a restitution claim? What would be the maximum restitution that the Government would claim?

MR. OTT: We anticipate, Your Honor, that it would be $630,000. $630,900—691.35.

JUDGE PROPST: Do each of you understand that you are subject to a claim of restitution by the Government in an amount of $630,691.35?

MR. CERNY [Counsel for Diversified]: Your Honor, the contract has not been fully performed. I think that is the total amount under the contract, so—

JUDGE PROPST: Well, all I am explaining to them now, Mr. Cerny, is what the maximum possible punishment and penalty is. The fact—if the Government is asserting a claim of restitution in that amount, that of course does not mean of necessity that the Government will be successful in asserting such an amount; but I am explaining to Mr. Helms, Jr., and Mr. Helms, Sr., what the maximum possible is. Do you understand, sir?

MR. RHEA [Counsel for Helms]: Judge, I believe—is it fair to say this is a maximum? They are notifying the Court that they will be claiming?

JUDGE PROPST: That is the maximum they will be subject to, because the Government has said that is the maximum they will claim.

Now, that is not a determination on my part as to any restitution.

MR. RHEA: That is what I want.

JUDGE PROPST: But I think Mr. Helms, Jr., and Mr. Helms, Sr., ought to know that that is the amount being claimed and that would be the amount they would be subject to.

(Transcript, p. 15, 1. 15–25, p. 16, 1. 1–22).

JUDGE PROPST: Mr. Helms., Jr., do you understand that the maximum possible punishment and penalty under all of these counts of which you are charged is fifteen year's imprisonment, $750,000 fine, or both, $150 special assessment fee, and restitution in the amount of $630,691.35?

MR. CERNY: Yes, sir.

MR. HELMS, SR.: Yes, sir.

(Transcript, p. 23, 1. 14–20).

MS. McCARTY [Assistant United States Attorney]: To date, Your Honor, the total loss sustained by the Government and the amount of money paid under this contract is $630—$630,691.35.

(Transcript, p. 55, 1. 19–21).

MR. HELMS, SR.: Yes, sir, Your Honor, I plead because I do have a son [Helms] that was an officer of the corporation as of September, and I respect his ability in this area of manufacturing

highly. He has done a great job I feel like.

JUDGE PROPST: No, no. Let's get around to this, Mr. Helms: I am not—we either need to—I am not trying to get anybody or talk anybody—or maybe to the contrary—but the issue is, the Court does not want to accept a plea of guilty from an individual or a corporation unless they are guilty. Now—

MR. HELMS, SR.: I understand this, sir.

JUDGE PROPST: We keep talking about everybody—what he would condone, or didn't condone, or so forth.

MR. HELMS, SR.: Yes, sir.

JUDGE PROPST: But what is the issue in this case as far as the corporation is concerned is this—whether or not—if the fins were manufactured to specification, then I assume there would be no misrepresentation as to fins being manufactured to specifications. So what I am asking you is, number one, the Government has said that they can offer proof that the fins were not manufactured to specifications. Are you saying they were manufactured according to specifications, all of them that were shipped?

MR. HELMS, SR.: All items, except the one thing I stated, Your Honor, was the hydrostatic test, which I have become aware of, and the company takes the responsibility for it, yes, sir.

JUDGE PROPST: And do you acknowledge then that there were misrepresentations or false statements made as to the hydrostatic testing?

MR. HELMS, SR.: Yes, sir. Now.

JUDGE PROPST: And do you also acknowledge that that was made by officers or agents—

MR. HELMS, SR.: In other words, employees.

JUDGE PROPST: Of the corporation?

MR. HELMS, SR.: And I didn't know it at the time until the present, and it was brought to my attention that this has been done, yes, sir.

JUDGE PROPST: Well, let me ask you this: after I have told you all that I have told you, do you still want to plead guilty on behalf of the corporation?

MR. HELMS, SR.: Yes, sir, because this is something that we didn't comply with—

(Transcript, p. 64, 1. 1–25, p. 65, 1. 1–18).

JUDGE PROPST: All right. Well, I am going to set the case for sentencing for November the 17th, at 10:00 a.m., in Birmingham, in each of these cases; and let me say this: At that time—let me say this with regard to the finding that I am making with regard to the factual basis for the plea, and, Mr. Helms, Jr., you correct me if I am wrong. I want to go back to this. Mr. Helms, Sr., you correct me if I state anything wrong.

Basically, what I am finding is that, in effect, that there is a factual basis for the plea based on this, that certain fins that were manufactured under this contract, that there were false statements or documents made or submitted to the Government with reference to those fins, that Mr. Helms, Jr., knew that such false statements or documents were being made or presented to the Government, and that he authorized or approved those false statements or documents being made or presented to the Government.

Now, Mr. Helms, Jr., do you disagree with that?

MR. HELMS, JR.: It wasn't that I authorized. I didn't—I didn't stop it from happening. I was aware of it going on. I didn't instruct it to be done.

JUDGE PROPST: Well, who was doing it? Who was doing it?

MR. HELMS, JR.: We have supervisors over shifts, and the supervisors were the ones that were not seeing that certain jobs were done; and I was allowing it to carry on. I allowed it.

JUDGE PROPST: You allowed it.

MR. HELMS, JR.: And I didn't—

JUDGE PROPST: All right. On that basis, I find that there is a factual basis for the plea. All right. Anything else from anybody?

MR. OTT: Not from the Government, Your Honor.

JUDGE PROPST: All right. Mr. Clerk, bring the jury in here. Let me say this while the jury is being brought in: At the time of sentencing, I would like for some—I may—I might like to hear from some people that may be directly involved, hear some testimony from some people that may be more acknowledgeable as to what their view is of exactly what Mr. Helms, Jr.'s, role in this was.

MR. OTT: Yes, Your Honor, we will have those available.

JUDGE PROPST: All right. And, of course, both of you understand that, as far as the restitution is concerned, that you will be in a position to offer evidence which will either contradict whatever may be offered by the Government.

(Transcript, p. 66, 1. 27 through p. 68, 1. 21).

JUDGE PROPST: All right. Let me just repeat. As to each defendant, the Court finds that the defendant's plea of guilty has been freely and voluntarily and knowingly entered by each defendant and that there is a requisite factual basis for the plea, and the Court has explained to defendant, each of them, all of their rights and what the maximum possible punishment and penalty is and will enter a judgment of guilty on the plea and will sentence on November 17, 1986, at 10:00 a.m. in the Federal Courthouse in Birmingham. And at that time each party should be prepared to offer whatever evidence you may wish to offer, particularly with regard to restitution; and I would also be interested in hearing some evidence from either side with regard to the specific role of Mr. Helms, Jr.

(Transcript. p. 70, 1. 21–25, p. 71, 1. 1–9).

During the acceptance of the guilty pleas on October 14, 1986, neither of the Assistant United States Attorneys nor Judge Propst said anything about the possibility of a subsequent civil action by the United States against Helms above and beyond any restitution judgment which might be entered against Helms at sentencing. In particular, nothing was said or hinted to indicate that the United States had or reserved the right not only to file such a civil action, but also that Helms' adjudication of guilt would be preclusive on the issue of his civil liability under 31 U.S.C. § 3731(d) and 18 U.S.C. § 3664(e), or that 31 U.S.C. § 3729 allows the imposition of treble damages, or that such a civil judgment would not be dischargeable in bankruptcy. These facts would be most material to Helms' decision to plead guilty unless eliminated as issues.

In his affidavit filed on October 27, 1988, in support of his motion for summary judgment, Helms says about his guilty plea, *inter alia:*

It was my understanding that [if] [sic] the United States attempts to obtain civil restitution against me was not successful and that following the sentencing hearing, I would be free of any separate proceeding by the United States Government for restitution.

\*   \*   \*   \*   \*   \*

It was my understanding that the sentencing hearing in November, 1986, it was necessary for me and the United States Government to deal with all issues that would directly or indirectly punish me for any charges which had been made.

On November 17, 1986, as scheduled, Judge Propst started the sentencing hearing. On that day, the government offered eight witnesses, including Leon Holliverse, a procuring contracting officer, and defendants offered one witness. The sentencing hearing was interrupted and reconvened on November 19, 1986. On that date, the government offered two additional witnesses, and defendants offered four witnesses. Although this testimony has not been transcribed and read by this court, it is clear that the largest portion of it was devoted to the question of restitution liability. In other words, the amount of the loss sustained by the United States was the featured subject.

After the restitution hearing, Judge Propst, for reasons which this court can only speculate about because the reasons stated were not transcribed, entered orders

requiring Diversified to pay a fine of $750,-000.00 and restitution of $150,000.00 and requiring Helms to pay a fine of $2,500.00 but no restitution. The final sentencing order against Helms was entered by Judge Propst on November 20, 1986. The United States did not appeal from Judge Propst's denial of its requested restitution judgment against Helms.

Helms' sentence included a custodial term of four years, to be followed by a parole term. On November 24, 1986, pursuant to the recommendation of the U.S. Probation Office, Judge Propst modified Helms' probationary term to require 1,000 hours of community service, finding: "The Court feels it would be in the best interest of all involved." Since Helms' release from custody, he has successfully completed his 1,000 hours of community service while under parole supervision.

As it had a perfect right to do, the United States obtained a certificate of judgment from the Clerk in CR 86–PT–221–M against Diversified in the sum of $900,-300.00 (an addition of fine and restitution) and a certificate of judgment against Helms in the sum of the $2,500.00 fine. Thereafter, the United States engaged in substantial collection efforts against Diversified in CR 86–PT–221–M, just as a judgment creditor could do with any other civil judgment. The United States unfortunately has been unsuccessful in its collection efforts. The government filed the instant complaint against both Diversified and Helms on March 2, 1988, after Helms had been released from custody and, therefore, after any possible petition by Helms pursuant to 28 U.S.C. § 2255 had become academic. In this court's opinion, Helms would have had a better than average § 2255 petition if the government had jumped him civilly while he was still in jail.

On August 19, 1988, the United States obtained a default judgment in the instant case against Diversified in the sum of $460,000.00, based entirely on Diversified's failure to respond to the complaint and on an alleged collateral estoppel resulting from Diversified's adjudication of restitution liability in CR 86–PT–211–M. In other words, as against Diversified the government has obtained in this case no more than a judgment on a judgment, adding nothing to the rights the United States already had against Diversified, and, in fact, in an amount less than its certificate of judgment in CR 86–PT–221–M.

In the affidavit filed by Helms in support of his cross-motion for summary judgment, Helms asserts that his plea bargain agreement included an understanding between him and the government that his subsequent sentence, whether or not it would include a restitution order, would preclude any further claims against him by the United States arising out of the conduct complained of in the indictment. Helms, in effect, says that in the plea agreement the government expressly or impliedly limited itself by contract to whatever it could get by way of a monetary award from Judge Propst in the criminal case. The United States has filed no affidavit or other verified material to deny that there was such an understanding. It does argue that no such understanding can be deduced from the record of the Rule 11, F.R.Cr.P. hearing in CR 86–PT–211–M. Such a deduction would be a reasonable one, but here Helms swears, without contradiction, that there was such an agreement.

### Conclusions of Law

In its memorandum filed in support of its motion for summary judgment, the United States makes it clear that it is relying exclusively on Helms' conviction as its basis for civil liability. Strangely it seeks more money from Helms than it proved against his co-conspirator, Diversified, in this very case. The government argues that "Helms is now estopped from denying the facts as set out in those counts [to which he pled guilty]." It cites for this proposition *United States v. Thomas*, 709 F.2d 968 (5th Cir.1983). (Memorandum, p. 4). The affidavit attached by the United States to its motion for summary judgment in an attempt to prove the amount of its damages is by Mr. Holliverse, the same procuring contracting officer who was one of the government's witnesses at the restitution hearing held in CR 86–PT–211–M.

Presumably, Mr. Holliverse told Judge Propst the same things Mr. Holliverse now tells this court. The government now demands judgment against Helms in the precise sum of $770,720.46, but in its memorandum brief, it asks "in the alternative, that this Court grant partial summary judgment on the issue of liability and for damages as this Court deems proper." If this court could grant any relief to the United States under Rule 56, F.R.Civ.P., it would certainly be only upon the liability issue. There is no way this court could include a final adjudication of the amount owed. The issue of amount seems hopelessly confused. There are several obviously disputed questions of fact, and ambiguities, involving the amount of the loss sustained by the United States.

At a status conference, the court was able to ascertain from Helms, albeit not as well articulated by him as it would have been by a Philadelphia lawyer, that in defense of the claim he seeks to work a collateral estoppel against the United States and, in the alternative, to enforce a contract in the nature of an accord and satisfaction.

It is of passing interest that 31 U.S.C. § 3731(d) became effective on October 27, 1986, less than two weeks *before* Helms was sentenced and less than two weeks *after* Helms entered his plea of guilty. This new statutory provision, upon which the presidential ink was hardly dry on November 17, 1986, when Helms defended the government's restitution claim, provides:

Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or *nolo contendere,* shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

Judge Propst could not have warned Helms of this on October 14, 1986, unless he could read the Congressional mind. The sudden appearance of this statutory change after the Rule 11 hearing is not as significant as it otherwise might be because 18 U.S.C. § 3664(e) (at that time known as 18 U.S.C. § 3580(e)) had already accomplished the same purpose as applicable to this particular fact situation. Section 3664(e) already provided at the time of the Rule 11 hearing:

A conviction of a defendant for an offense involving the act giving rise to restitution under this section shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim.

Under the Victim and Witness Protection Act, the victim, *if not the United States,* has no right to appeal from a trial court's refusal to order restitution in the victim's favor or from the ordering of less restitution than the amount claimed by the victim. *United States v. Franklin,* 792 F.2d 998 (11th Cir.1986). This is *not* true if the victim actually intervenes and becomes a *party* to the restitution proceeding. *A fortiori,* when the United States is both the prosecutor and the victim, it can appeal from a denial of restitution. Here the United States was both prosecutor and victim. It did not appeal. Was it satisfied?

Important statutory changes in the VWPA took place between October 14, 1986, when Helms entered his guilty plea, and November 17–19, 1986, when the restitution hearing was held. On October 14, 1986, 18 U.S.C. § 3579(a) and (d) read as follows:

(a)(1) The court, when sentencing a defendant convicted of an offense under this title or under subsection (h), (i), (j), or (n) of section 902 of the Federal Aviation Act of 1958 (49 U.S.C. 1472), may order, in addition to or in lieu of any penalty authorized by law, that the defendant make restitution to any victim of the offense.

(2) If the court does not order restitution, or orders only partial restitution,

under this section, the court shall state on the record the reasons therefor.

\* \* \* \* \* \*

(d) The court shall impose an order of restitution to the extent that such order is as fair as possible to the victim and the imposition of such order will not unduly complicate or prolong the sentencing process.

Effective November 1, 1986, this section was renumbered 18 U.S.C. § 3663, and the following statutory language was substituted for the language above-quoted:

(a) The court, when sentencing a defendant convicted of an offense under this title or under subsection (h), (i), (j), or (n) of section 902 of the Federal Aviation Act of 1958 (49 U.S.C. 1472), may order, in addition to or, in the case of a misdemeanor, in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense.

\* \* \* \* \* \*

(d) To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order.

This new statutory language, which did *not* apply when Helms' guilty plea was offered and accepted, but which *did* apply when the restitution claim was considered, required that a restitution judgment be entered unless the trial court expressly found that the fashioning of the restitution order would unduly complicate or prolong the sentencing process and no longer required an explanation "on the record." This new language left the trial judge with a much narrower area of discretion than he had previously had. For aught appearing, on November 17, 1986, Judge Propst was operating as if the predecessor statute were still in effect and without actual knowledge of the very recent substantial change in the law. Although his reason or reasons for denying restitution were only expressed orally, Judge Propst did articulate a reason or reasons for his denying an order of restitution against Helms, as would have been required under the prior statute. In his sentencing order entered on November 20, 1986, Judge Propst referred to "reasons [for denying restitution] dictated into the record in open court."

No federal court has addressed the legal effect of a change in the VWPA between an adjudication of guilt and an imposition of sentence, assuming that this court's research has been exhaustive on the subject. There is nothing to indicate that the United States pointed out to Judge Propst the hiatus or problem inhering in the statutory change. The United States clearly did not appeal from Judge Propst's denial of a restitution judgment against Helms. Whether Judge Propst's denial of restitution was or was not erroneous under the law and the evidence at that time may never be known.

■ The general rule is, of course, that the doctrine of estoppel cannot be applied against the United States. *Beaver v. United States*, 350 F.2d 4 (9th Cir.1965), *cert. denied*, 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966). This general rule can be avoided, however, in order to avoid manifest injustice or where there are exceptional circumstances. *Union Oil Co. of California v. Morton*, 512 F.2d 743 (9th Cir. 1975); *Donovan v. Master Printers Ass'n*, 532 F.Supp. 1140 (N.D.Ill.1981), *aff'd*, 699 F.2d 370 (7th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). This general rule is also inapplicable when the usual rules of claim or issue preclusion apply as a product of prior litigation between the same parties, one of whom is the United States.

■ The undisputed facts in Helms' situation lead this court to an application of claim preclusion against the United States. This case *does* present "exceptional circumstances." And here, to refuse belatedly to impose a sizeable, non-dischargeable civil judgment against Helms will "avoid manifest injustice." As already noted, it is impossible to know everything that went through Judge Propst's mind when he re-

fused to enter a restitution judgment against Helms. It may have been Judge Propst's knowledge that a judgment in excess of $500,000 not dischargeable in bankruptcy against a young, unemployed man with a family would be as great a punishment as a 20–year term in a debtor's prison. Certainly to enter an unmanageable, non-dischargeable judgment against Helms in the instant case would be more in the nature of punishment than a realistic device for recovering the government's loss. The probation officer who supervises Helms indicates to this court not only that Helms has no possible way to pay $500,000 but that the pendency of this civil suit has contributed to Helms' wife leaving him and has caused considerable demoralization, making Helms' rehabilitation difficult, if not impossible, as long as this potential for civil liability is around his neck. Probably the only way even a good machinist can raise a half million dollars in this day and age is to switch from operating a machine into operating a cocaine distribution business.

Another bothersome feature of this case (there are several) is the fact that the government waited until after Helms was released from custody before bringing this suit. If, shortly after being denied restitution by Judge Propst, the government had filed suit against Helms, Helms could, and probably would, have responded with a 28 U.S.C. § 2255 petition, seeking to avoid his plea of guilty on the basis of its being involuntary or its being induced by a mistake of fact or law. This has already been mentioned, but it bears repeating. The government got what it bargained for in the way of punishment, but now wants to pile on Helms a punishment worse, as a practical matter, than that already meted out and, for the most part, served.

Even before the enactment of the unequivocal statutes making a criminal conviction conclusive in subsequent civil litigation involving the same defendant, the courts recognized the identical principle. *Matter of Raiford,* 695 F.2d 521 (11th Cir. 1983). The question here, then, is whether adjudicating the criminal issues creates a one-way street or a two-way street. The

fact that the United States has here invoked the doctrine of collateral estoppel as an offensive weapon against Diversified, the corporation, but denies its use as a defense by Helms, suggests a paradox which may reach the proportion of unconstitutional unfairness. Sauce for the goose should be sauce for the gander, even where the gander is the sovereign.

As its defense against Helms' Rule 56 motion, the United States relies almost entirely upon *United States v. Killough,* 625 F.Supp. 1399 (M.D.Ala.1986), *aff'd,* 848 F.2d 1523 (11th Cir.1988). In *Killough,* the Eleventh Circuit, while certainly recognizing the usual limitations upon the application of estoppel to the government, also recognizes:

> [F]or estoppel to apply to the government (1) the traditional elements of estoppel must have been present; (2) the government must have been acting in its proprietary capacity as opposed to its sovereign capacity; and (3) the government's agent must have been acting within the scope of his or her authority.

848 F.2d at 1526.

In Helms' case, the government has not formally pled or proven a lack of authority by the Assistant United States Attorneys who negotiated the plea agreement to agree not to pursue a civil remedy, that is, unless its invocation of *Killough* can be construed as such an assertion inasmuch as *Killough* does stand for the proposition that a government lawyer cannot bind the government beyond his or her actual authority. *Killough* is a case which, in effect, renders the concept of ostensible agency inapplicable to the government. However, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), requires more of the non-movant under Rule 56 than that the non-movant stand mute. *The non-movant must affirmatively establish a dispute of material fact.* The United States here has not presented any affidavit whatsoever by an AUSA who actually participated in negotiating the plea agreement with Helms. Therefore, this court must accept as true what Helms says in his affidavit. This

leaves the court with only one question to be answered, namely, whether, as a matter of law, Helms could rely upon the negotiated understanding or promise that he would face no monetary claim by the United States unresolved at the sentencing hearing. For at least two reasons, *Killough* neither applies to nor controls Helms' fact situation. First, in *Killough* the issue of the AUSA's authority to waive civil liability did not arise out of a plea bargain but out of a grant of immunity from criminal prosecution. The scope of an AUSA's authority to enter into a binding plea bargain agreement and the scope of his authority to grant immunity is materially, even dramatically, different. Second, and more important, *Killough* did not even remotely involve the VWPA, which by its terms miraculously turns the AUSA in a criminal proceeding into a civil collection attorney and simultaneously places upon him a dual responsibility. This court has previously expressed its chagrin and doubt over the built-in conflict of interest for an AUSA under the VWPA where the "victim" is a third-party and not the United States itself. *See United States v. Welden,* 568 F.Supp. 516 (N.D.Ala.1983), and some of the subsequent law review commentators. No other court seems to worry about this inherent conflict of interest, but where, as here, the "victim" *is* the United States, an AUSA can certainly wear comfortably the two hats which the VWPA requires him to wear. He or she can simultaneously be both prosecutor and collector on behalf of the same client, as he or she deems most advantageous to the client United States. In other words, the VWPA expressly or by necessary implication gives an AUSA authority that the AUSA did not have in *Killough.* The AUSAs here, who have conspicuously not denied the substance of Helms' affidavit or of the understanding therein described, did have the authority to bind the United States to that understanding, whether the understanding is properly characterized as an accord and satisfaction or as an adjudication constituting collateral estoppel, or both. The essential elements of contract were present. If detrimental reliance has any meaning as "consideration," it was certainly present here.

Under either theory of defense, the United States is precluded, after the denial of restitution by Judge Propst, from filing a civil action against Helms for the same loss alleged in the criminal case under the VWPA.

On the present state of the record, this court, as stated, cannot be sure of Judge Propst's rationale for denying restitution against Helms. Perhaps Judge Propst recognized that Helms did not profit from his illegal acts, or perhaps Judge Propst recognized that Helms was and would remain financially incapable of paying the enormous sum of money claimed by the United States. It is even possible that Judge Propst intuited the Seventh Circuit's recent apposite pronouncement in *United States v. Mahoney,* 859 F.2d 47 (7th Cir.1988). There, Hon. John L. Coffey, speaking for the Seventh Circuit, says:

Initially, we note that at the conclusion of the sentencing hearing, the judge stated that "in terms of restitution, I have no way of knowing to what extent restitution can ever meaningfully be realized in this case." This statement leads us to question the extent to which the judge actually took into account the defendant's ability to pay and the needs of his wife when ordering full restitution. "[A]lthough the VWPA does not necessarily require full satisfaction of the defendant's obligations to his dependents before awarding any sum to the victims, it does require some principled balancing between the needs of both potential classes of recipients." [*United States v.*] *Gomer,* 764 F.2d [1221] at 1223–24 [ (7th Cir.1985) ]; See also *id.* at 1224 N. 6 ("[T]he committee's intention is that the offender's ability to pay will be a factor in the restitution order, and that the order will cover a period that will reasonably assure full and complete payment of the restitution order notwithstanding any maximum period of probation or incarceration the defendant could have served.") (quoting S.Rep. No. 532, 97th Cong., 2d Sess. 31–32, reprinted in 1982

U.S.Code Cong. & Ad.News 2515, 2537–38).

More significantly, the restitution order itself—which requires the defendant to make full restitution (totalling over $288,000) over the requisite five-year period of payment—leaves little doubt that the judge simply forgot or disregarded the defendant's ability to pay and the needs of his dependent wife as well. We fail to perceive how this defendant, a man without any tangible assets and a $30,000 annual salary—will somehow be able to repay a debt totalling more than nine times his annual salary in five years. The judge did note that Mahoney may have to rely on his family to help support his wife; but without any evidence in the record as to their financial capability, there is no factual basis for this conclusion that they could in fact provide that support. Moreover, even assuming the defendant's children could support the defendant's wife, we still harbor doubts about how Mahoney could under any stretch of the imagination make full restitution in five years. Thus, a combination of the restitution order itself and the judge's statements during sentencing convinces us that it is "not improbable" that the judge failed to consider the mandatory factor regarding the imposition of restitution when imposing sentence under § 3580(d). We thus fail to comprehend the basis for the court's order.[6]

Our holding in this case is in accord with our prior dispositions of similar cases. For example, in *United States v. Lovett*, 811 F.2d 979, 990 (7th Cir.1987), this court's construction of the restitution requirements of 18 U.S.C. § 3651 emphasized that: "[t]his circuit had recognized that the amount ordered to be paid in restitution as a condition of probation must be ascertained and delineated with an accurate computation and must be clearly set out with specific findings and directions in the record and order of restitution." In the context of the VWPA, both the majority and dissenting opinions in *Gomer* mandated that the sentencing court consider the needs of a defendant's dependents. The majority noted: "The VWPA expressly requires the sentencing judge to consider 'the financial needs and earning ability of the defendant's dependents.' 18 U.S.C. § 3580(a)." 764 F.2d at 1222. Similarly, the dissenting judge, although disagreeing with the majority's position that a failure to consider this issue constituted "plain error," clearly recognized: "Admittedly, § 3580(a) requires the court to consider not only the 'loss sustained by the victim' but also the financial needs and earning ability of the defendant and the 'defendant's dependents.'" 764 F.2d at 1226 (Coffey, J., dissenting). Thus, we have consistently recognized the need to consider the needs of dependents and the ability of a defendant to pay restitution.

\* \* \* \* \* \*

Thus, *an impossible order of restitution, as made in this case, is nothing but a sham,* for the defendant has no chance of complying with the same, thus defeating any hope of restitution and impeding the rehabilitation.

---

[6] The government cites *United States v. Fountain*, 768 F.2d 790 (7th Cir.1985), for the proposition that the possibility of a change in the defendant's financial circumstances (such as the defendant's winning the lottery) justifies an order of full restitution. *Fountain* involved the murder of two prison guards by prison inmates. We affirmed an order of restitution well beyond the defendants' foreseeable ability to pay based upon the judge's concern that "such accomplished and audacious murderers might have a story to sell to a publisher or broadcaster, and he wanted to make sure they would never reap any gain from their crimes." *Id.* at 803. The case before us presents a completely different situation: in *Fountain* the judge articulated a reasonable rationale for ordering full restitution, and a factual basis in the record supported the stated rationale. Here we have neither. The prospect of the defendant's winning a lottery—present in any case—is too remote a possibility to justify the restitution order in this case. Furthermore, if the government wished to take such a possibility into account, it would be free to make a restitution recommendation based upon an accurate portrayal of defendant's means, reserve the right to seek modification if conditions change and

present such a recommendation to the court during the terms of the defendant's probation.

(emphasis supplied).

In *Mahoney,* Judge Coffey also says in footnote 5:

> Presumably the defrauded institutions could obtain a civil judgment against Mahoney and enforce it to the hilt regardless of his financial situation. (And like an order of restitution, a debt incurred through fraud would not be dischargeable in bankruptcy.)

The brooding threat noted in footnote 5 is exactly what Helms sought to avoid when he plea bargained. It makes good sense that a man with dependents, with no job, and prospectively with a prison record, would think like the Seventh Circuit eloquently thinks and would not want to be saddled with an impossible financial burden to hound him for the rest of his life. Debtor's prison would be better than a non-dischargeable money judgment in excess of $500,000.00. Apparently, Helms was not thinking in terms of winning the lottery jokingly referred to by the Seventh Circuit; he did not want to place himself at the mercy of the goddess of chance. Instead, he made a deal which made sense and narrowed the odds. After all, the words "plea bargain" include the word "bargain." If the government can do what it is requesting to do here, Helms is not getting what he bargained for. In effect, the government is being allowed to renege.

Because the United States has not controverted Helms' affidavit, as required by *Celotex,* 447 U.S. at 317, 106 S.Ct. at 2548, the court takes Helms' version of what transpired before and during his Rule 11 criminal hearing as true, and necessarily concludes that the United States is foreclosed from pursuing this or any other separate civil action against Helms, which, if successful, would be just as much of a "sham"—to borrow a word from the Seventh Circuit—as the impossible-to-pay restitution judgment which Judge Propst refused to grant would have been.

This court finds that the undisputed facts here are dispositive of plaintiff's claim. The case is one that need not await factual development at trial in order for the court to evaluate the simple, uncontroverted evidence which answers the following three questions: (1) Was there a meeting of the minds during the plea bargaining process creating a contract of accord and satisfaction?; (2) Did Judge Propst's decision to deny restitution contemplate a preclusion of further inquiry into the subject of damages?; and, (3) To what extent, if any, was Helms misled by any representations made by the United States, triggering an application of estoppel by a combination of government conduct and Helms' ignorance of the true facts? *See Sweeten v. U.S. Dept. of Agriculture Forest Service,* 684 F.2d 679 (10th Cir.1982); *Santos v. Franklin,* 493 F.Supp. 847 (E.D.Pa.1980). Answered in Helms' favor, any one of these questions leads to summary judgment in his favor. This court answers each and all of the three questions in Helms' favor.

For the foregoing reasons, the Rule 56 motion of the United States will be denied, and the Rule 56 motion of Helms will be granted.